ANTONIO ABAD SANTIAGO MERCADO y WILSON FERRER PABÓN, demandantes y recurrentes, *v.* DESIDERIO CARTAGENA, ETC., demandados y recurridos.

*Número:* R-81-284      *Resuelto:* 2 de marzo de 1982

*Pedro Ortiz Álvarez, Luis Murphy, Hernán Morales y Carlos J. Córdova,* abogados de los recurrentes; *Héctor A. Colón Cruz, Procurador General, y Federico Cedó Alzamora, Procurador General Auxiliar,* abogados de los recurridos.

## SENTENCIA

Los recurrentes, Antonio Abad Santiago Mercado y Wilson Ferrer Pabón, se desempeñaban como Agentes Investigadores II de la Policía de Puerto Rico en Ponce. El

---

día 30 de abril de 1981 el agente Santiago fue trasladado a trabajar a Aguadilla y el agente Ferrer a Arecibo.

Con motivo de dicho traslado los agentes presentaron una demanda de *injunction* y daños y perjuicios contra el Superintendente y otros oficiales de la Policía. Alegaron en la demanda que el traslado era un castigo por las expresiones que ambos hicieron con relación a la corrupción que existía entre los oficiales de la Policía de Ponce, en una conferencia de prensa celebrada el 29 de abril de 1981 en la que participó el señor Ángel David González, Presidente de la Asociación de Miembros de la Policía. Alegaron, además, que el agente Santiago había escrito un memorando confidencial en el que también denunciaba los serios problemas de corrupción que había en la Policía, mencionando a oficiales por sus nombres. Se expresó en dicho memorando que el agente Ferrer era testigo del asunto.

También alegaron que los traslados, por ser a sitios distantes de sus residencias, les causaban grandes perjuicios económicos y emocionales, pues tenían que incurrir en mayores gastos de transportación y les privaba de estar más tiempo con su familia. El agente Santiago, quien reside en Guánica, fue trasladado a Aguadilla y el agente Ferrer, quien reside en Mayagüez, fue trasladado a Arecibo.

. Los demandados presentaron una moción de desestimación y el tribunal de instancia declaró con lugar la solicitud bajo el fundamento de que la jurisdicción primaria correspondía a la Junta de Apelaciones del Sistema de Administración de Personal (JASAP). Los demandantes recurrieron de dicha sentencia desestimatoria y expedimos orden para mostrar causa por la cual no debía expedirse el auto de revisión solicitado, revocar la sentencia y disponer que continúen los procedimientos ante dicho tribunal hasta la adjudicación final del caso en sus méritos.

Los recurridos han comparecido a mostrar causa. Su

posición es que siendo la acción interpuesta por los recurrentes una relacionada con las áreas esenciales al principio de mérito y los derechos de un empleado permanente, la jurisdicción primaria para conocer de la misma reside en la Junta. Señalan que la Junta está "en mejor posición, por su 'expertise' para pasar, en primera instancia, juicio en cuanto a si los traslados obedecieron en realidad a necesidades del servicio o a hábitos o actitudes del empleado, a situaciones de tensión creadas por querellas o acusaciones de éste, a consideraciones simples y llanamente discriminatorias, o paradójicamente, a petición del mismo". (Escrito para mostrar causa, pág. 10.) Con relación a la reclamación principal de los recurrentes de que los traslados se debían a sus expresiones en la conferencia de prensa, lo que constituía un castigo por ejercer su derecho a la libre expresión, el recurrido manifiesta que ésta es una suposición venturada que surge de las opiniones personales de los recurrentes, carente de todo fundamento y que en forma alguna justifica la preterición del cauce administrativo y el abandono de la doctrina de jurisdicción primaria.

La posición de los recurridos no nos persuade. Las alegaciones de la demanda unidas al hecho de que los traslados tienen lugar al día siguiente de la conferencia de prensa son suficientes para exponer una probable violación del derecho constitucional de los recurrentes a la libre expresión. La reivindicación de los derechos constitucionales corresponde y puede reclamarse en primera instancia en los tribunales de justicia, sin que tenga jurisdicción original sobre ello el foro administrativo. *Pierson Muller I* v. *Feijoó*, 106 D.P.R. 838 (1978).

Los traslados en estos casos obligan a largas y onerosas distancias entre los nuevos lugares de trabajo y las residencias de los recurrentes. Ello les afecta económica y emocionalmente, ya que disponen de menos tiempo para estar con sus familias. Estos hechos sirven para distinguir

este caso del de *Pedraza Rivera* v. *Collazo Collazo*, 108 D.P.R. 272 (1979), donde se trasladó a una empleada del pueblo de Trujillo Alto a Carolina. Allí este Tribunal expresó que no estaban presentes hechos que originaran una presunción válida de discrimen por ideas políticas y que el hecho escueto del traslado a un pueblo colindante no delataba un agravio que reclamara urgente reparación.

Por las razones antes expuestas se expide el auto, se revoca la sentencia recurrida y se ordena se continúen los procedimientos hasta la adjudicación final de este caso en sus méritos.

Así lo pronunció y manda el Tribunal y certifica la Secretaria. El Juez Asociado Señor Martín emitió voto disidente al que se une el Juez Asociado Señor Dávila. El Juez Presidente, Señor Trías Monge, y el Juez Asociado Señor Negrón García se inhibieron. El Juez Asociado Señor Negrón García emitió voto de inhibición el 4 de enero de 1982.

(*Fdo.*) Lady Alfonso de Cumpiano

*Secretaria*

—O—

Voto disidente del Juez Asociado Señor Martín al cual se une el Juez Asociado Señor Dávila.

Disiento de la sentencia emitida en este caso. Entiendo que actuó correctamente el Tribunal Superior al desestimar la demanda de *injunction* de los recurrentes al dictaminar que la jurisdicción primaria corresponde a la Junta de Apelaciones del Sistema de Administración de Personal (JASAP). El tribunal de instancia expresó que no se justifica un desvío del trámite administrativo ordinario ante una demanda que en esencia alega que el traslado de los agentes policiales demandantes desde Ponce a Aguadilla y Arecibo respectivamente, fue ordenado como una represalia contra dichos agentes por haber hecho expre-

siones públicas sobre la corrupción policíaca existente en al área de Ponce en la que servían. La demanda no demuestra que hubiese necesidad de utilizar el recurso extraordinario de *injunction* en razón de que "el procedimiento ordinario no prove[e] un remedio rápido, adecuado y eficaz, para corrección [*sic*] de un agravio de patente intensidad al derecho del individuo que reclame urgente reparación". *Otero Martínez* v. *Gobernador*, 106 D.P.R. 552, 556 (1977). Véanse además, *Pedraza Rivera* v. *Collazo Collazo*, 108 D.P.R. 272 (1979); *Pierson Muller I* v. *Feijoó*, 106 D.P.R. 838 (1978); *Febres* v. *Feijoó*, 106 D.P.R. 676 (1978).

Al evaluar si una demanda de *injunction* en la que se alega que determinada transacción de personal público violó derechos constitucionales, expone una alegación de sustancialidad tal que amerite no aplicar los principios de jurisdicción primaria y agotamiento de remedios, los tribunales deben considerar el interés envuelto y concluir que la parte peticionaria tiene una probabilidad real de prevalecer en los méritos de su petición. 32 L.P.R.A. sec. 3524 inciso 3(2).

Por ello debe examinarse la eventualidad de que en efecto se hubiese causado la violación de algún derecho constitucional a la luz del efecto de la transacción de personal sobre la parte demandante así como los posibles objetivos legítimos de la transacción en cuestión.

La faz de la demanda revela que los agentes demandantes se quejan de sendos traslados de Ponce a Aguadilla en un caso y a Arecibo en otro. El agente Santiago, trasladado a Aguadilla, (1) reside en Guánica, por lo que en lugar de viajar 25 millas desde Guánica a Ponce vendría

---

(1) El agente Santiago había ya indicado sentirse molesto por cierta situación existente en el cuerpo policíaco de Ponce, por lo que había expresado en comunicación de 3 de marzo de 1981 dirigida al Cdte. Nelson Almodóvar que su deseo era ser trasladado de Ponce al área de Mayagüez si la situación no se resolvía. Apéndice del recurso, pág. 38.

obligado a viajar 48 millas. El agente Ferrer, trasladado a Arecibo, [2] reside en Mayagüez, por lo que la distancia a la nueva plaza es de 49 millas comparada con 46 de la anterior. [3] El agente Santiago viajará una distancia de 23 millas adicionales, presumimos que le tomará 1/2 hora adicional. El agente Santiago recorrerá aproximadamente la misma distancia que antes del traslado.

Los datos precedentemente mencionados no revelan un agravio de patente intensidad al derecho de los demandantes que requiera urgente reparación a través del recurso privilegiado de *injunction* que ameriten eludir el ordenado cauce administrativo. *Otero Martínez*, supra.

Por otro lado, no podemos pasar por alto que siendo la Policía un cuerpo gubernamental cuasi militar encargado de velar por el mantenimiento del orden público y la seguridad de los ciudadanos, la disciplina de sus miembros es factor esencialísimo y el espíritu de cuerpo es de vital importancia para apoyar las normas de obediencia que deben imperar para sostener el orden institucional. En su consecuencia, en un momento dado y por circunstancias que las autoridades policíacas consideren justificantes —tales como la discordia entre compañeros, divergencia o diferencias entre supervisores y supervisados, contrariedades o conflictos con la ciudadanía del sector donde se ejerce la labor policíaca, indisciplina en el trabajo, u otras razones legítimas— las autoridades policíacas podrían trasladar provisional o permanentemente a cualquier miembro de la Policía del sector donde trabaja a otro sector, en aras del bien del servicio, cuyas consideraciones deberán ser justificadas o probadas en su día por las partes.

---

[2] El agente Ferrer expresó, en apelación presentada ante la Junta de Apelaciones de Personal por los mismos hechos aquí planteados, que hacía 4 años que venía solicitando se le trasladase a Mayagüez. Apéndice del recurso, pág. 46.

[3] Hemos tomado conocimiento de las distancias mencionadas del "Cuadro indicando distancias entre pueblos" publicado por la Autoridad de Carreteras, a 31 de diciembre de 1980.

La Ley de Personal del Servicio Público de Puerto Rico, 3 L.P.R.A. sec. 1301 *et seq.*, en su sec. 4.4, *Id.* sec. 1334, prohibía los traslados como medida disciplinaria, excepto "cuando respondan a necesidades del servicio según se establezca mediante reglamento, y el traslado no resulte claramente oneroso para el empleado". Al reconocer luego la Asamblea Legislativa que era necesario hacer una excepción para aquellos sistemas en que se utilice el concepto de rango para autorizar traslados como medida disciplinaria procedió a enmendar la Ley de Personal al efecto, autorizando además descensos o degradaciones como medidas disciplinarias.

Las disposiciones enmendadas y ampliadas son las siguientes:

(5) Los traslados no podrán ser utilizados como medida disciplinaria ni podrán hacerse arbitrariamente. Sólo podrán hacerse a solicitud del empleado, o cuando respondan a necesidades del servicio según se establezca mediante reglamento y el traslado no resulte oneroso para el empleado. *Se exceptúan de esta disposición aquellos sistemas en que se utilice el concepto de rango.* (Enmienda en bastardillas.)

.  .  .  .  .  .  .  .

(9) *En aquellos sistemas en que se utilice el concepto de rango, se podrá utilizar el traslado, descenso o degradación como medida disciplinaria siempre y cuando sus leyes orgánicas lo autoricen. En estos casos no se requerirá el consentimiento del empleado.* (Enmienda en bastardillas.)

En virtud de las citadas enmiendas es preciso que la legalidad y procedencia de las aludidas transacciones de personal sea analizada en primera instancia por el cuerpo especializado creado por la propia Ley de Personal para ese propósito: la Junta de Apelaciones. 3 L.P.R.A. sec. 1394(1). Es este organismo el que debe dilucidar los hechos y circunstancias que rodean la transacción y a la luz de ellos determinar si los traslados obedecieron a necesidades del servicio o si son de carácter disciplinario, y si había

autoridad legal y/o reglamentaria para efectuarlos. La alegación de que los traslados en controversia constituyen una violación del derecho a la libre expresión y que estuvieron motivados por discrimen político, no son suficientes para justificar un desvío del trámite ordinario ordenado por la ley y la sana práctica administrativa, máxime cuando a diferencia de un despido o destitución no acarrea daños irreparables.

Por las razones expuestas precedentemente, confirmaría la sentencia recurrida que remite la causa al foro administrativo.

—O—

Voto de inhibición del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 4 de enero de 1982

El silencio casi sacrosanto que debe imperar antes de toda resolución judicial, la inmensa soledad en que se encuentra un juez previa a adoptar un curso de acción, la naturaleza eminentemente privilegiada y de inspiración moral-jurídica que toda decisión de inhibición, a iniciativa propia, conlleva —independientemente de la jerarquía del Juez— y las circunstancias excepcionales del caso de autos, nos compelen a reducir por escrito, certificar y ordenar la inmediata publicación de esta descalificación.(1) Su comprensión exige una breve relación de la causa de acción que lo origina, los protagonistas directa e indirectamente envueltos y el trámite que pende ante nos.

Se trata de una demanda de *injunction* y daños y perjuicios contra el Superintendente, Sr. Desiderio Cartagena, y otros oficiales de la Policía basada en la alegación de que los demandantes recurrentes, agentes Santiago Mercado y Ferrer Pabón, siendo funcionarios de

---

(1) El Canon XII, *in fine*, dispone sobre la "resolución escrita en la que [el Juez] hará constar [la] causa [de inhibición] con notificación de la misma a todas las partes". Cánones de Ética Judicial, 4 L.P.R.A. Ap. IV-A.

carrera, como castigo, fueron trasladados por expresiones que hicieron en conferencia de prensa efectuada el 29 de abril de 1981 —con la participación del Sr. Ángel David González, Presidente de la Asociación de Miembros de la Policía, Inc.— denunciando serios problemas de corrupción de oficiales de la uniformada en el área de Ponce, y, además, por haber éstos declarado bajo juramento el 30 de abril que el proceso de selección y reclutamiento está ". . . permeado de prejuicio político partidista, toda vez que para poder ingresar . . . hay que ser miembro del Partido Nuevo Progresista".

El Tribunal Superior, Sala de Ponce, a petición del Estado desestimó bajo el fundamento de que la jurisdicción correspondía a la Junta de Apelaciones del Sistema de Administración de Personal (JASAP). A solicitud de los demandantes, este foro emitió orden para mostrar causa por la cual no debería revocarse ese dictamen. El caso pende *sub judice.*

## I

A manera de introito anticipamos la posibilidad de que para algunos juristas, y aun personas legas no compenetradas con la dinámica del proceso decisorio, las razones que compelen esta abstención no sean suficientes o no guarden tal grado de intensidad como para reflejar la existencia real de un posible prejuicio, ánimo prevenido o estado anímico de índole inhibitoria. Podría argumentarse que una disciplina férrea judicial acumulada por años y el apego a los postulados éticos, son fundamentos para despejar cualesquiera dudas al respecto y adjudicar con ecuanimidad ética e intelectual éste y otros pleitos análogos. No negamos validez a tal proposición. "Ciertamente, inquietudes de esta índole prenden instintivamente en toda conciencia con un sentido de lo justo y ético, aunque es de lugar reconocer que en materia de deontología profesional se impone el respeto a todos —y con mayor justificación—

no puede haber reclamos de infalibilidad." *Ortiz Angleró* v. *Barreto Pérez*, 110 D.P.R. 84, 105 (1980) (opinión concurrente).

Más bien creemos que concurren situaciones particulares que nos mueven a invocar aquí el principio cardinal del Canon XI de Ética expositivo de que "[e]l Juez no solamente ha de ser imparcial, sino que su conducta *ha de excluir toda posible apariencia* de que es susceptible de actuar a base de influencias de personas, grupos o partidos, o de ser influido por el clamor público, por consideraciones de popularidad o notoriedad, o por motivaciones impropias", en interacción con el Canon XII(g) indicativo de que procede la inhibición "por cualquier otra causa que pueda razonablemente arrojar dudas sobre su imparcialidad para adjudicar o que tienda a minar la confianza pública en el sistema de justicia".

Tanto el Canon XII como la Regla 63 de Procedimiento Civil de 1979 relacionan en detalle los motivos básicos tradicionales de inhibición, susceptibles de ser científicamente clasificados, según su génesis, así: (1) por razón del *objeto del litigio,* cuando existe un vínculo de interés moral o material entre lo que se debate y la figura del magistrado; (2) por *razón de las partes en conflicto,* amistad o enemistad entre el juez y los litigantes; y (3) por *razón de los foros llamados a intervenir,* como por ejemplo, haber intervenido previamente como abogado, consejero o juez en el pleito.

Ahora bien, el verdadero cambio en materia inhibitoria en nuestra jurisdicción se opera al rubricarse la regla o norma de "apariencia de parcialidad". Bajo la misma, "[p]ara que proceda la inhibición, no obstante, se ha indicado en repetidas ocasiones que no es imprescindible probar la existencia de prejuicio o parcialidad de hecho; *basta con la apariencia de* parcialidad o prejuicio". (Énfasis suplido.) *Pueblo* v. *Martés Olán,* 103 D.P.R. 351, 355 (1975).

El vocablo *prejuicio*, en su prístina acepción significa "acción y efecto de *prejuzgar*". Este verbo a su vez implica "juzgar las cosas antes del tiempo oportuno, o sin tener de ellas conocimiento cabal". Prejuiciado es quien "tiene prejuicio de antemano". I. Rivera García, *Diccionario de Términos Jurídicos*, 1976, pág. 211. Se admite, pues, que en el sentido peyorativo *prejuicio* denota "parcialidad" o falta de neutralidad judicial. Más allá de su aspecto negativo, en sus variadas definiciones idiomáticas y valor semántico denota "juicio previo", "juicio anticipado" o "juicio a destiempo". Un autor nos habla de ". . . la expresión de *pre-concepto*, que no es otro que aquel que luego atribuiremos a *pre-opinión*. Tiene gran interés, en cambio, percibir la diferencia entre 'juzgar antes de tiempo' y adoptar una decisión 'previamente a los hechos o argumentos que deben conocerse'; una cosa es juzgar 'antes de tiempo', esto es, adelantándose *extemporáneamente*, y otra muy distinta el *haber tenido que juzgar previamente*, pero sin salirse del marco del deber jurídico; *de igual manera que habremos de distinguir del juzgamiento realizado en virtud de la investidura de magistrado judicial, el concepto emitido como simple ciudadano o, al menos, sin formar parte de esa magistratura".* (Énfasis suplido.) S. Sentís Melendo, *Estudios de Derecho Procesal*, Buenos Aires, Ediciones Jurídicas Europa-América, 1967, T. 1, pág. 241.

## II

Prescindiendo de si el régimen de la inhibición debe evaluarse bajo el prisma de derecho administrativo ético o legal jurisdiccional, la "doctrina ha distinguido, sustancialmente, dos situaciones en el magistrado que le crean inhibiciones de conocer. Por un lado, se distingue al juez que se encuentra en tal situación personal que no es posible confiarle de ninguna manera el conocimiento del asunto. Se habla, entonces, de *judex inhabilis*. En estos

casos, la imposibilidad de conocer es absoluta. La situación equivale íntegramente, a nuestro régimen de impedimento.

Al lado de *judex inhabilis*, se encuentra el *judex suspectus*. En él no hay propiamente impedimento absoluto, sino causa de recelo o simple motivo de sospecha". E. J. Couture, *Estudios de Derecho Procesal Civil*, 2da ed. Buenos Aires, Ediciones Depalma, 1978, T. III, pág. 127. Este autor expone que en su terminología legal el vocablo *inhibición* tiene tres dimensiones:

> . . . denota, tan sólo, el hecho del alejamiento del magistrado, su apartamiento de un asunto concreto respecto del cual tiene motivo de impedimento, de recusación o abstención. Cuando un juez se halla impedido, *debe inhibirse* de conocer; cuando un juez es recusable, *se le inhibe* de conocer; cuando un juez solicita derecho de abstención, *puede inhibirse* de conocer. En cuanto a los vocablos particulares, se utilizan en su preciso sentido legal: *impedimento*, es la inhibición por prohibición legal; *recusación* es inhibición por voluntad de la parte afectada; *abstención* es inhibición por voluntad del magistrado. *Op. cit.*, pág. 128.

Esta clasificación tripartita y sus notas diferenciales las explica así:

> *El impedimento* es un motivo grave de inhibición: configura una circunstancia que obsta en modo absoluto al conocimiento de un asunto determinado, por parte del juez. Ni aun mediando acuerdo de partes, es posible que entienda en el asunto un juez impedido. Su deber de alejamiento es inmediato. No necesita esperar que las partes se manifiesten a este respecto, ni requiere autorización del superior para desprenderse del conocimiento del asunto.

> *La recusación* configura causa leve de inhibición; no se trata de implicancia, es decir, de incapacidad absoluta, ya que si la parte perjudicada con el motivo de sospecha acepta la intervención del magistrado, éste debe seguir conociendo en el asunto. El alejamiento del magistrado no es inmediato cuando media motivo de recusación; su deber es dar cuenta a las partes y esperar a que éstas se manifiesten; la conformidad expresa o tácita purifica el motivo de sospecha

y dota al juez de aptitud plena para intervenir en el asunto; prestada esa conformidad en forma expresa o tácita, existe preclusión del procedimiento dirigido a alejar al magistrado, y éste debe seguir conociendo en el asunto. En el caso de que el magistrado entienda que no existen motivos de sospecha, el procedimiento de recusación surge como un derecho de la parte, cuya finalidad es obtener del superior un pronunciamiento dirigido a alejar al juez del conocimiento del asunto.

*La abstención* no configura una causal de inhabilidad, ni siquiera un motivo de sospecha. Es una situación de conciencia que autoriza al juez a ser relevado de la intervención en el asunto. Es un derecho de tipo administrativo que tienen todos los funcionarios públicos, y que consiste, sustancialmente, en liberarlos del conflicto moral que representa tener que decidir en asuntos en los cuales razones de decoro o de delicadeza les crean un estado particular de violencia moral. Este tipo de derecho no alcanza a las partes en ningún sentido. Éstas son ajenas a una situación que se produce exclusivamente dentro de la conciencia moral del magistrado. No pueden requerir a éste su alejamiento del asunto, ni les es dado tampoco, obtenerlo por intermedio de su superior jerárquico. *Op cit.*, págs. 133–134.

El concepto de abstención, también conocido como excusación, configura un derecho privativo del magistrado que se basa en razón de existir *causas de decoro o delicadeza*. Las partes no tienen derecho a invocarlo, sólo el juez. ¿Qué se entiende por decoro y delicadeza?

El decoro es un concepto de excepcional amplitud. Abarca, no sólo el honor, sino también el respeto, la reverencia, el recato y la estimación. Es no sólo la consideración externa de una persona, sino también su propia estimación. Abarca tanto el prestigio social representado por la dignidad del comportamiento, como el respeto que una persona debe a los dictados de su propia conciencia. Hiere el decoro no sólo una ofensa recibida, claramente perceptible, sino también la insinuación malevolente, el estado de recelo, la sospecha o el desdén. El juez puede sentirse herido en su decoro si la parte le supone incapaz de juzgar con independencia en determinado asunto; pero su integridad de espíritu, la

elevada conciencia de su misión y el sentido de su responsabilidad pueden también colocarle por encima de tales sospechas y su propio decoro puede conducirle a la conclusión contraria. Se trata, sustancialmente, de una actitud de orden espiritual, que puede conducir, indistintamente, a una u otra solución.

Los grados extremos de la conducta social, la actitud decorosa o indecorosa, pueden percibirse claramente. Pero en las situaciones limítrofes, sólo la conciencia del magistrado le habrá de decir qué es lo que se entiende por razón de decoro.

En cuanto al concepto de delicadeza, constituye en cierto modo, una extensión del anterior. *Delicadeza* está tomada, en la ley, no en su sentido directo de finura, ternura o suavidad, sino también de escrupulosidad y de miramiento. En este sentido, al no considerar como sinónimas ambas palabras, habría que admitir que la delicadeza constituye un grado superlativo del decoro. Sería, así, el honor y la propia estimación llevados a su grado extremo. *Op. cit.*, págs. 184-185.

## III

Otro aspecto que aflora en el caso de autos como motivo de abstención, que está íntimamente relacionado con el "juicio a destiempo", es la opinión, recomendación o señalamiento fuera del estrado sobre un asunto sometido al juez o susceptible —por la naturaleza del asunto o la jerarquía jurisdiccional del magistrado— de serle en el futuro sometido. En nuestra opinión concurrente y disidente en *P.S.P., P.P.D., P.I.P.* v. *Romero Barceló*, 110 D.P.R. 248, 308-309 (1980), rechazamos los enfoques y conductas que socavan y menguan la ética judicial. Dijimos que:

Aunque intangible, la ética es fuerza que se percibe, detecta e intuye. En contraste con la importante función clásica del abogado de defender ante los tribunales a un litigante en particular o abogar en una causa criminal, la misión del juez de juzgar con eticidad, esto es, con imparcialidad y

verdad, cobra clara dimensión y sentido moral jurídico en los gnómicos versos de Machado: *"[T]u verdad no, la verdad. Vamos a buscarla. La tuya guárdatela."* (Escolio omitido.)

Y añadimos:

Deferencialmente objetamos todo desmerecimiento a la verticalidad y ejecutorias de la magistratura puertorriqueña del pasado y presente. Los jueces no subsistimos en cámaras de oxígeno. "No somos autómatas del derecho, ajenos a las injusticias, el dolor o a los agravios. No vivimos en mundos distantes o apartes. Neutralidad judicial no es sinónimo de insensibilidad." *Ortiz Angleró*, supra, págs. 94–95. Nunca hemos sido espectadores pasivos de las inequidades y agravios oficiales ni sordos a los reclamos de justicia. *Sencillamente respetamos un compromiso de honor contraído al prestar juramento, de autodisciplina judicial, de juzgar, combatir los males sociales y remediar las injusticias lícitamente, sólo en la esfera de nuestra propia competencia, a saber, los dictámenes y pronunciamientos adjudicativos desde el estrado de los tribunales. No consideramos permisible hacernos eco y asumir representaciones de oráculo de lenguaje esotérico y anfibológico, enjuiciando a destiempo desde otras tarimas y foros públicos, las actuaciones, posturas y filosofías políticas de quienes en determinado horizonte histórico detentan los Poderes Constitucionales restantes.* [Énfasis nuestro.]

No olvidemos: "No puede diversificarse la persona que a la vez es juez. El desempeño del cargo exige autolimitaciones que no se extienden a otras profesiones. *La línea entre una opinión personal y cuando actúa como órgano judicial es muy tenue. Es casi imposible, por no decir ilusorio, deslindarla. Cuando se hace pública, se quiebra y desaparece.* Así la rúbrica judicial se proyecta en toda su extensión e intensidad en las opiniones de jueces a título personal y pueden sobrevenir malas interpretaciones y especulaciones. *Para los efectos señalados, un juez siempre es juez."* *Ortiz Angleró*, supra, pág. 104.

A estas reflexiones hemos de añadir que si bien la Constitución denomina a los órganos básicos del poder como Legislativo, Ejecutivo y Judicial, los dos primeros,

por su naturaleza, son poderes públicos de índole político-partidista. El Poder Judicial no goza ni puede ostentar o promover tal apellido. Por ello, toda generación de juristas precisa estar alerta contra el resurgimiento del personaje del sumo sacerdote del sanedrín, esta vez como máximo exponente del fariseísmo ético-judicial. Vale recordar la siguiente admonición:

> Debemos evitar la impresión, aunque ésta sea errónea, de que decimos unas cosas en nuestros discursos y escritos y hacemos otras en la práctica. *García Cruz* v. *El Mundo, Inc.*, 108 D.P.R. 174, 191 (1979) (Rigau, J., opinión concurrente).

## IV

A la luz de lo antes expuesto es que debemos evaluar *sua sponte* nuestra intervención o abstención en el caso de autos. Sobre todo, es importante tener presente que el ejercicio de jurisdicción en toda causa judicial depende del presupuesto de la "absoluta idoneidad personal [del magistrado] *despejada de toda sospecha o recelo* . . .". (Énfasis suplido.) Couture, *op. cit.*, pág. 132. Veamos.

Las partes envueltas son los agentes Santiago Mercado y Ferrer Pabón como demandantes. Como demandado principal figura el Superintendente Desiderio Cartagena. Los dos primeros presuntivamente pertenecen a la Asociación de Miembros de la Policía, Inc., entidad que preside el Sr. Ángel David González. Tomamos conocimiento judicial de que la referida Asociación se ha caracterizado por intentar el mejoramiento y protección de sus miembros a través de distintos señalamientos, avenidas y tácticas militantes. Su presidente ha hecho, individual y junto a otros miembros, denuncias sobre corrupción y mala administración en la Uniformada. Se ha alegado un serio deterioro y una politización extrema en sus métodos de reclutamiento y ascenso. Esta última denuncia ha encontrado eco en algunos sectores político-partidistas del país y

funcionarios públicos. El Juez Presidente, Hon. José Trías Monge, el 26 de diciembre de 1981, en un mensaje opinó:

Como juez, me he referido también públicamente a algunas de las materias de que hablaré hoy. Mi interés sobre estos vitales asuntos no data en consecuencia de ahora. El deterioro creciente de la situación me obliga a regresar al tema.

La primera injusticia, fuente de muchas otras, que se perpetra contra el policía en nuestra comunidad es la politización de la Fuerza. Los políticos o, para mayor exactitud, algunos políticos, tradicionalmente no han entendido que hay ciertas instituciones del país que tienen que vivir fuera de su control: la Policía, los tribunales, las instituciones educativas, las uniones, las asociaciones de empleados. Al policía le han vulnerado sus más sagrados derechos. El policía tiene derecho a que sus ideas políticas no jueguen papel alguno en su carrera. Se ha avanzado bastante en la aplicación del principio del mérito, pero hay mucho campo por cubrir. Se premia a quien no se debe premiar; se margina a quien no se debe marginar. Nuestra Constitución ordena que no se discrimine contra nadie por razones políticas. El policía en Puerto Rico no goza todavía plenamente de esta protección constitucional.

Tal situación es intolerable. El policía no debe estar a la merced del gobierno de turno. El policía es un profesional, un profesional de la justicia, al igual que el fiscal o el juez. No debe violarse su dignidad de ser humano. Hay que respetar su libertad a abrigar las ideas que desee, dentro de su juramento de fidelidad a las constituciones de Puerto Rico y Estados Unidos. El mérito de un policía no puede medirse sobre la base de su fidelidad a tal o cual partido. "El Policía y la Comunidad", Mensaje a la Asociación de Miembros de la Policía de Puerto Rico, Inc.

Específicamente, como dato adicional, meses atrás el Sr. Ángel David González presentó y juró denuncia criminal contra el Superintendente Cartagena por alegada negligencia en el cumplimiento del deber consistente en no investigar unos piquetes que agentes y oficiales contrarios realizaron frente a las oficinas de la Asociación. En la

etapa sobre determinación de existencia de causa probable, el abogado principal del señor Cartagena —designado por el Presidente del Colegio de Abogados— fue nuestro hermano, Lic. Arturo Negrón García.

## V

El conocimiento de estos hechos de inmediato produce en nuestro ánimo ciertas reservas éticas. De un lado, la participación de un familiar como abogado, no en este caso, sino en otro, en un incidente aislado e inconsecuente, pero en que algunos de los protagonistas son los mismos. Por otro lado, las opiniones del Juez Presidente refrendando a priori, la tesis de politización en la Policía ante la Asociación de Miembros de la Policía, Inc., teoría en que se fundamenta el caso de autos. ¿Amerita ello nuestra abstención? Una reflexión al respecto, bajo la norma de *apariencia externa,* nos lleva a concluir que cualesquiera de las dos circunstancias apuntadas son razones de peso suficientes para que se produzca la inhibición como único camino compatible con los principios de imparcialidad y neutralidad judicial. La ausencia de precedente no milita en contra.

En esa misión, y en ausencia de modelo inspirador superior, el espíritu recto se fortalece en su intimidad por *la dignidad del silencio, concepto eje de la ética judicial.* El buen juez, pues, evita toda conducta que mine la confianza pública en la neutralidad del Poder Judicial. Sabe que la suspicacia es el elemento corrosivo más dañino y difícil de subsanar de la estabilidad, convivencia y paz social. *Descubre a tiempo que la metamorfosis del abogado al jurista se produce y se consuma no sólo con la opinión correcta en derecho o el discurso académico, sino engalanada en una ejemplar conducta de moral, neutralidad y dignidad judicial.*

.    .    .    .    .    .    .    .

Una vez más, "no podemos evitar pensar que esta ponencia suscite críticas o equívocos torpemente interpretados. Habrá quienes el simple abordar este tema les resultará rubori-

zante, mortificante o un tanto irritante. No es ese nuestro deseo. Tampoco será la primera ni última vez que el quehacer judicial genere tales reacciones." *Ortiz Angleró*, supra, págs. 105–106. Ninguna de esas u otras reacciones disonantes constituirán razones suficientes para el jurista abdicar su jurisdicción, empañar la nitidez de su óptica judicial, *opacar la integridad de su ética* o abjurar los dictados de su conciencia. . . . (Énfasis suplido.) *P.S.P., P.P.D., P.I.P.* v. *Romero Barceló*, supra, págs. 311–312.

La Secretaria General certificará y notificará inmediatamente la presente a los abogados de las partes y al Colegio de Abogados para su oportuna publicación.