MIRIAM J. RAMÍREZ DE FERRER, recurrente y peticionaria, *v.* JUAN MARI BRÁS, recurrido, y la COMISIÓN ESTATAL DE ELECCIONES, recurrida y peticionaria; SECRETARIO DE JUSTICIA, interventor.

*Número:* CT-96-14          *Resuelto:* 10 de abril de 1997

*Juan Santiago Nieves* y *Fermín L. Arraiza Navas,* de *Nazario & Santiago,* abogados del peticionario; *Carlos Lugo Fiol, Procurador General,* abogado del Secretario de Justicia, parte interventora.

Decisión del Juez Asociado Señor Corrada Del Río referente a moción sobre recusación.

I

La recurrente Miriam J. Ramírez de Ferrer, ejercitando el derecho que le conceden los Arts. 2.022 y 2.023 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. secs. 3072 y 3073, presentó ante la Junta de Inscripción Permanente (en adelante la J.I.P.) del Precinto 38 de Mayagüez —la cual está adscrita a la Comisión Estatal de Elecciones (en adelante la C.E.E.)— una solicitud de recusación contra el recurrido Juan Mari Brás, para pedir su exclusión del registro de electores por motivo de que éste no es ciudadano de Estados Unidos. Después de ciertos trámites ante la J.I.P. y la comisión local, la C.E.E. determinó que no se había adquirido jurisdicción alguna sobre la persona del recusado por supuestos defectos del emplazamiento, a pesar de que el

recusado había comparecido de forma voluntaria ante el organismo electoral para admitir que había renunciado formalmente a dicha ciudadanía.

No conforme con la decisión de la C.E.E., la recurrente Ramírez de Ferrer acudió mediante revisión judicial ante el Tribunal de Primera Instancia, Sala Superior de San Juan. El recurrido Mari Brás compareció ante dicho tribunal en oposición al recurso y admitió su comparecencia voluntaria ante la comisión local de elecciones de Mayagüez; admitió su renuncia a la ciudadanía de Estados Unidos, pero reclamó, no obstante, su derecho como elector en Puerto Rico. Argumentó que la Ley Electoral de Puerto Rico podía ser interpretada en el sentido de que para cumplir con el requisito estatutario de ciudadanía era suficiente ser ciudadano de Estados Unidos o de Puerto Rico, sin tener que serlo de ambos sitios. Argumentó, en la alternativa, que si el estatuto requería ambas ciudadanías, éste violaba diversos tratados internacionales que eran parte del Derecho federal de Estados Unidos y violaba, además, derechos constitucionales básicos.[1]

Luego de los trámites procesales correspondientes, y la celebración de la vista con la comparecencia de las partes, de la C.E.E. y la intervención del Estado por conducto del Procurador General, el tribunal de instancia dictó sentencia el 21 de octubre de 1996, habiéndose archivado en autos una copia de su notificación a las partes en esa misma fecha. Mediante esa sentencia el tribunal de instancia revocó la decisión de la C.E.E. que desestimó la recusación, que fue objeto del recurso por falta de jurisdicción sobre el recusado, y en su lugar declaró inconstitucional lo dispuesto en los Arts. 2.003 y 2.022-A de la Ley Electoral de Puerto Rico, 16 L.P.R.A. secs. 3053 y 3072a, en cuanto éstos disponen, como condición para ser elector en Puerto Rico, que no es suficiente ser ciudadano de Puerto Rico, sino que es necesario también ser ciudadano de Estados

---

[1] Sentencia del tribunal de instancia, págs. 1–3; Petición de certificación, Apéndice, págs. 3–5.

Unidos. Ordenó, por tal motivo, la desestimación y el archivo de la recusación en los méritos.

La C.E.E. presentó contra dicha sentencia un recurso de *certiorari* ante el Tribunal de Circuito de Apelaciones en el Caso Núm. KLCE96-01063, en el que señaló que el tribunal de instancia erró al declarar inconstitucional la Ley Electoral de Puerto Rico en cuanto ésta dispone —como condición para ser elector en Puerto Rico— ser ciudadano de Estados Unidos.

La recurrente Ramírez de Ferrer también interpuso un recurso de *certiorari* ante el Tribunal de Circuito de Apelaciones en relación con la sentencia en el Caso Núm. KLCE96-01071. En él señaló que el tribunal de instancia cometió tres (3) errores, a saber: (*a*) al resolver que los Arts. 2.003 y 2.022-A de la Ley Electoral de Puerto Rico, *supra*, son inconstitucionales; (*b*) al reconocer una ciudadanía o nacionalidad de Puerto Rico independiente de la ciudadanía o nacionalidad de Estados Unidos, y (*c*) al emitir un dictamen contrario a la cláusula territorial, contrario a la cláusula de supremacía de la Constitución federal y contrario a la legislación.

La C.E.E. presentó ante este Tribunal una Petición de Certificación el 24 de octubre de 1996 para solicitar que, dada la importancia y la naturaleza de las cuestiones planteadas, en particular la inconstitucionalidad de ciertas disposiciones de la Ley Electoral de Puerto Rico, se elevase ante nuestra consideración el caso Núm. KLCE96-01063, entonces pendiente ante el Tribunal de Circuito de Apelaciones.

Mediante Resolución de 25 de octubre de 1996 expedimos un mandamiento de certificación para que se presentaran los autos originales de dicho caso, así como los autos originales en el caso ante el tribunal de instancia, para nuestra consideración. Dispusimos, además, que dada la proximidad de las elecciones generales se permitiera al recurrido Mari Brás emitir su voto, el cual se tendría por recusado.

Mediante Resolución de 1ro de noviembre de 1996, a solicitud de parte, expedimos un mandamiento de certificación en el caso de la recurrente Ramírez de Ferrer pendiente ante el Tribunal de Circuito de Apelaciones, Caso Núm. KLCE96-01071, que ordenaba a su vez la consolidación de ambos recursos.

Estos casos están pendientes ante nuestra consideración, habiendo presentado las partes y el interventor sus alegatos. A petición del recurrido Mari Brás, señalamos una vista oral para el 14 de abril de 1997.

## II

Mediante una moción sobre recusación presentada por el recurrido Mari Brás el 8 de abril de 1997, éste solicita la inhibición del Juez aquí suscribiente. En esa misma fecha, el Juez Presidente Señor Andréu García nos dirigió un memorando en el cual indicó que "[s]iendo de su exclusiva incumbencia la moción de recusación presentada por el recurrido, Lcdo. Juan Mari Brás, pláceme asignarle el asunto para su consideración".

En síntesis, el recurrido señala que mientras nos desempeñábamos como Secretario de Estado[2] intervinimos directamente y participamos activamente en la controversia relativa a la existencia, el alcance y la eficacia jurídica de la ciudadanía puertorriqueña, al haber emitido, en nuestra condición de Secretario de Estado, opinión y criterio sobre el particular.

Acompañan a la moción tres (3) anejos. El Anejo 1 es una carta suscrita por nosotros, como Secretario de Estado, dirigida al Lcdo. Alejandro Torres Rivera, en la que reiteramos lo expresado en un comunicado de prensa de 6 de mayo de 1993 en el sentido de que "[a] tenor con el Ordenamiento Jurídico vigente, el Secretario de Estado del Estado Libre Asociado de Puerto Rico carece de facultad para

---

[2] Este cargo fue desempeñado por el Juez suscribiente desde 2 de enero de 1993 hasta 15 de julio de 1995.

expedir a usted un pasaporte reconociéndole la ciudadanía puertorriqueña". Caso Núm. CT-96-14, 2da pieza, Anejo 1.

El Anejo 2 es un comunicado de prensa emitido por la Oficina de Comunicaciones del Departamento de Estado el 3 de junio de 1993 titulado "Sin Facultad Estado para Expedir Pasaporte Puertorriqueño", en el que se expresa literalmente lo siguiente:

El Secretario de Estado, Hon. Baltasar Corrada del Río contestó formalmente la solicitud del señor José Santori Coll a los efectos de que el Departamento de Estado de Puerto Rico le expidiera un pasaporte puertorriqueño. En su misiva, enviada al Lcdo. Ramón Edwin Colón Pratts, representante legal del señor Santori Coll, el Lcdo. Corrada del Río reiteró que a tenor con el ordenamiento jurídico vigente el Secretario de Estado del Estado Libre Asociado de Puerto Rico carece de facultad para expedir pasaportes de Puerto Rico a los puertorriqueños que pretendan renunciar o hayan renunciado a su ciudadanía americana. El señor Santori Coll presentó ante el Tribunal de Distrito Federal para el Distrito de Puerto Rico una solicitud de Sentencia Declaratoria a los efectos de renunciar a su ciudadanía americana en Puerto Rico y no desde un país extranjero como lo dispone la Ley Sobre Inmigración y Nacionalidad, INA por sus siglas en inglés. Dicha ley define a Puerto Rico como un estado y dispone que la renuncia a la ciudadanía americana no puede darse bajo territorio americano.

El Secretario de Estado contestó también otras tres solicitudes con el mismo propósito reiterando que no existe disposición alguna ni en la Constitución ni en las leyes de Puerto Rico que le dé autoridad como Secretario de Estado de Puerto Rico para expedir pasaportes puertorriqueños.

Por otro lado, el Departamento de Estado reitera su posición en cuanto al alcance de la ciudadanía de Puerto Rico. Según aclara el Tribunal Supremo de Puerto Rico en el caso de *Lokpez v. Fernández*, 61 D.P.R. 522 (1943) el alcance de la ciudadanía de Puerto Rico establecida por el Acta Jones se limita a los efectos de domicilio o residencia y no tiene reconocimiento oficial a nivel internacional para los fines de pasaporte. Por otra parte, según estableció la Ley Sobre Inmigración y Nacionalidad, 8 USC 1402, la ciudadanía de los Estados Unidos hace a los ciudadanos de Puerto Rico, acreedores al pasaporte Estadounidense y a más ningún otro. "Puerto Rico, declaró Corrada del Río, no es un país soberano sino un territorio de los Estados Unidos, y carece de autoridad legal para emitir sus propios pasaportes". El Secretario de Estado añadió que "la nacionalidad de los puertorriqueños a los fines de un pasaporte es la americana, por ser los puertorriqueños ciudadanos de los Esta-

dos Unidos y por ser la ciudadanía de Puerto Rico un simple reconocimiento del domicilio de la persona y no de una nacionalidad amparada en la soberanía de Puerto Rico, la cual no existe bajo el Estado Libre Asociado". Caso Núm. CT-96-14, 2da pieza, Anejo 2, págs. 1–30.

El Anejo 3 es una carta de la Lcda. Rita L. Pruetzel, entonces Directora de Asuntos Legales del Departamento de Estado, de 8 de julio de 1993, en la cual envió al licenciado Torres Rivera una copia de una opinión legal que dio lugar a la denegatoria de expedición de un pasaporte puertorriqueño que le había pedido dicho letrado, así como otros ciudadanos, y le envió una copia del comunicado de prensa de 3 de junio de 1993, que es el Anejo 2, antes transcrito.

Fundamentado en lo anterior, el recurrido plantea en su moción de recusación que habida cuenta de la intervención, la opinión escrita y las declaraciones públicas del Juez que suscribe, en nuestra condición anterior de Secretario de Estado, resulta obvio que tenemos "[u]na opinión formada y predispuesta por su contacto previo con la controversia". Hace referencia a la Regla 63.1(e) de Procedimiento Civil, 32 L.P.R.A. Ap. III, y a los Cánones XI y XII del Código de Ética Judicial, 4 L.P.R.A. Ap. IV-A.

En particular, se señala lo siguiente:

1. Que un juez debe inhibirse por haber sido abogado o consejero de cualquiera de las partes o sus abogados en el pleito pendiente ante él. Regla 63.1(c) de Procedimiento Civil, 32 L.P.R.A. Ap. III.

2. Que un juez debe inhibirse por cualquier otra causa que pueda razonablemente arrojar dudas sobre su imparcialidad para adjudicar o que tienda a minar la confianza pública en el sistema de justicia. Regla 63.1(e) de Procedimiento Civil, *supra.*

3. Que el juez no solamente ha de ser imparcial, sino que su conducta ha de excluir toda posible apariencia de que es susceptible de actuar a base de influencias de personas, grupos o partidos, o de ser influido por el clamor público, por consideraciones de popularidad o notoriedad, o

por motivaciones impropias. Canon XI del Código de Ética Judicial, *supra.*

4. Que un juez no debe entender en procedimiento judicial alguno en que la ley le prohíba actuar, incluyendo, pero sin limitarse a cualesquiera de los casos siguientes: por haber sido abogado o asesor de cualesquiera de las partes o de sus abogados en la materia en controversia y por cualesquiera otra causa que pueda razonablemente arrojar dudas sobre su imparcialidad para adjudicar o que tienda a minar la confianza pública en el sistema de justicia. Canon XII del Código de Ética Judicial, incisos (c) y (g), *supra.*

### III

Vistas las cuestiones planteadas y examinados los argumentos contenidos en la moción de recusación, pasamos a atenderlos y considerarlos con la mayor ponderación.

En primer lugar, aceptamos la aseveración que hace el recurrido en su moción de que su presentación "se hace de buena fe y bajo la firme convicción y creencia en la pureza de los procedimientos judiciales, en sus participantes y en sus mecanismos inherentes para liberar el proceso de toda apariencia razonable de impropiedad".[3] No tenemos duda de ello.

Es precisamente con esa misma buena fe y con la firme convicción y creencia en la pureza de los procedimientos judiciales, que entendemos que no procede nuestra inhibición. Nos explicamos a fondo.

No tenemos una opinión formada y predispuesta sobre la controversia ante nuestra consideración en el caso de epígrafe.

En el caso de autos, el recurrido plantea que la Ley Electoral de Puerto Rico debe ser interpretada en el sentido de que para cumplir con el requisito de ciudadanía es suficiente ser ciudadano de Estados Unidos o de Puerto

---

[3] Moción de recusación, pág. 12, párrafo 29.

Rico, sin tener que serlo de ambos sitios, y, en la alternativa, que de interpretar la Ley Electoral de Puerto Rico en el sentido de que se requieren ambas ciudadanías para votar, se estarían violando diversos tratados federales y sus derechos constitucionales básicos. El tribunal de instancia declaró la inconstitucionalidad de ciertos artículos de la Ley Electoral de Puerto Rico por entender que éstos exigían ambas ciudadanías para poder votar.

Nada de esto se nos planteó cuando desempeñábamos el cargo de Secretario de Estado. Según surge con toda claridad de los Anejos 1, 2 y 3 que acompañan la moción de recusación, lo que tuvimos ante nuestra consideración no tenía que ver con la Ley Electoral de Puerto Rico, ni requería que nos expresáramos sobre el derecho al voto de una persona domiciliada o residente de Puerto Rico que hubiera renunciado a la ciudadanía de Estados Unidos. El asunto que consideramos en nuestra capacidad de Secretario de Estado fue si teníamos autoridad para expedir pasaportes de Puerto Rico a personas aquí domiciliadas o residentes, fueran o no ciudadanos de Estados Unidos. En aquella ocasión examinamos las disposiciones legales pertinentes al cargo de Secretario de Estado y no encontramos autoridad en ley para expedir pasaportes. Nos parece imposible e improcedente ampliar el alcance de la controversia entonces planteada ante el Departamento de Estado hasta los confines que definen la controversia ahora ante este Tribunal.

El pasaporte es una "[l]icencia o despacho por escrito que se da para poder pasar libre y seguramente de un pueblo o país a otro".(⁴) Igualmente, el término *passport* ha sido definido como:

> ... [e]vidence of permission from sovereign to its citizen to travel to foreign countries and to return to land of his alle-

---

(⁴) *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. II, pág. 1020. Véase, además, I. Rivera García, *Diccionario de Términos Jurídicos*, 2da ed. rev., Orford, Ed. Equity Pub. Co., 1985, pág. 198.

giance, as well as request to foreign powers that such citizen be allowed to pass freely and safely.([5])

En 1993, como Secretario de Estado, expresamos que no siendo Puerto Rico un pueblo soberano a los fines de sus relaciones internacionales, sino un territorio de Estados Unidos, y no habiendo disposición alguna que nos autorizara en ley a expedir pasaportes, nos veíamos precisados a denegar solicitudes para expedirlos.

En la moción de recusación, el recurrido señala que ante un planteamiento de impugnación electoral mediante el cual se intentó descalificarlo como elector "hemos argumentado ante este Alto Foro que la ciudadanía puertorriqueña es de carácter nacional y no domiciliaria, que el Pueblo de Puerto Rico tiene soberanía suficiente en su *Constitución* para validarla y hemos rechazado la interpretación antihistórica que se recoge en *Lókpez v. Fernández,* [supra,] argumento principal introducido por el entonces Secretario de Estado". (Énfasis en el original.) Moción sobre recusación, pág. 3.

Es necesario considerar los límites de los deberes que nos competían mientras desempeñamos el cargo de Secretario de Estado. Cierto es que en el comunicado de prensa (Anejo 2), en el cual se resume la esencia de la opinión legal suscrita por una abogada de la División Legal del Departamento de Estado, hacemos referencia al caso de *Lokpez v. Fernández,* supra, pág. 534, en el cual este Tribunal expresó, entre otras cosas, que "[s]ólo somos ciudadanos de Puerto Rico en el sentido de que somos residentes de Puerto Rico, teniendo la palabra residente el alcance de domiciliado".

Como Secretario de Estado estábamos obligados a respetar y acatar la decisión de este Tribunal, traída a nuestra atención entonces por la División Legal de dicho departamento.

---

([5]) *Black's Law Dictionary,* 5ta ed., Minnesota, Ed. West Publishing Co., 1979, pág. 1012.

El recurrido sostiene que debemos rechazar la "interpretación antihistórica" recogida en dicho caso. Como Juez, y conjuntamente con los otros Jueces de este Alto Foro, tenemos la facultad de determinar si ese caso, o cualquier otro caso decidido por este Tribunal, debe ser sostenido, revocado, distinguido o modificado a la luz de los planteamientos del recurrido y las otras partes ante nos. Estamos en disposición de examinar esta cuestión con mente abierta, como lo debe estar todo juez cuando se le plantea la revocación, modificación o distinción de un caso anteriormente resuelto por este Tribunal. Esa autoridad no la teníamos como Secretario de Estado, siendo entonces nuestra función examinar cualquier precedente aplicable a la cuestión de si podíamos expedir un pasaporte puertorriqueño, en virtud de la Constitución y las leyes, según interpretadas por el Tribunal Supremo de Puerto Rico. Nunca se llevó un recurso de *mandamus* para cuestionar nuestra decisión de entonces y, de haberse llevado, y haber resuelto un tribunal de justicia que estábamos obligados por la Constitución y las leyes a expedir pasaportes puertorriqueños, nuestro deber hubiera sido cumplir con esa obligación.

De todos modos, esa tampoco es la controversia ante nosotros en el caso de autos, ya que, según discutimos anteriormente, aquí se plantea la constitucionalidad de la Ley Electoral de Puerto Rico, por lo que nos sentimos enteramente libres de resolver según nuestra conciencia judicial.

## IV

La referencia que se hace en la moción de recusación a la Regla 63.1(c) de Procedimiento Civil, *supra*, y al Canon XII(c) del Código de Ética Judicial, *supra*, es inapropiada. Estas disposiciones requieren la inhibición de un juez cuando ha sido abogado o asesor de las partes o de sus

abogados en la materia en controversia. Éstas son totalmente inaplicables al caso de autos, puesto que no hemos sido abogado, ni asesor o consejero de las partes o sus abogados en esta controversia. Asumiendo que el planteamiento se refiere al Estado, debemos recordar que el Secretario de Justicia, no el Secretario de Estado, es el asesor o consejero legal del Estado. Aparte de que, como hemos señalado, la controversia ante nos en el caso de autos no es lo que estuvo ante nos como Secretario de Estado.

En cuanto a lo dispuesto por la Regla 63.1(e) de Procedimiento Civil, *supra*, y el Canon XII(g) del Código de Ética Judicial, *supra*, a los efectos de que un juez debe inhibirse por cualquier causa que pueda arrojar dudas sobre su imparcialidad para adjudicar o que tienda a minar la confianza pública en el sistema de justicia, hemos explicado, y lo reiteramos, que cualquier duda sobre nuestra imparcialidad debe quedar totalmente disipada. Ello porque al aceptar anteriormente, como Secretario de Estado, que no teníamos autoridad en ley para expedir pasaportes de Puerto Rico, lo hicimos aplicando precedentes que fueron traídos a nuestra atención por la División Legal de dicho departamento, los cuales no podíamos descartar, y porque nos sentimos en libertad de examinar —sin ánimo prevenido— la controversia ante nuestra consideración en el caso de autos, irrespectivamente de nuestro contacto con ciertos aspectos de la controversia en un contexto completamente distinto.

## V

Unas consideraciones finales. Se alega que por la función que desempeñamos como Secretario de Estado tenemos una opinión formada sobre la controversia que da paso al caso de autos. Como antes señalamos, nunca hemos tenido la función de dictaminar sobre la controversia ahora ante nos. No obstante, entendemos la importancia de seña-

lar que si aun un juez llegara a este Tribunal con ciertos criterios sobre una controversia que este Foro deba dilucidar, no sería automáticamente necesaria su recusación. Véase *Laird v. Tatum*, 409 U.S. 824 (1972). El tratadista Richard E. Flamm explica en su obra *Judicial Disqualification* la doctrina aplicable:

> ... [T]he fact that a judge has merely written or spoken about issues that are involved in a case pending before him is rarely a sufficient ground for disqualification. R. Flamm, *Judicial Disqualification: Recusal and Discualification of Judges*, Boston, Ed. Little, Brown and Co., 1996, Sec. 10.11, pág. 313.

La presunción controlante es que un juez cumplirá con los deberes de su posición, como le fueron impuestos por su juramento. "In the absence of contrary evidence of a substantive nature, ... it is generally presumed that a judge will abide by her judicial oath." (Escolio omitido.) Flamm, *op. cit.*, Sec. 10.8, pág. 305. Esta presunción nos impide cuestionar la imparcialidad de un jurista a base de sus experiencias anteriores. Al respecto expone el tratadista Flamm en su obra:

> Sec. 10.11 *Disqualification on the Basis of a Judge's Experience*
>
> Just as a judge's impartiality ordinarily may not be questioned on the basis of his background attributes or institutional affiliations, no inference of judicial bias presumptively arises as a result of a judge's life experiences. Indeed, a judge is expected to be influenced by his real life experiences.
>
> Typically, the experience a judge has acquired does not supply a basis for seeking his disqualification, and this is true whether such experiences were acquired in his personal life, during the course of practicing law, *in his previous position in the executive branch of government*, in his past role as a state legislator, or when he was acting as a member of Congress. (Escolios omitidos y énfasis suplido.) Flamm, *op. cit.*, Sec. 10.11, págs. 310–312.

Los jueces no nacen jueces. Véase *Brody v. President & Fellows of Harvard College*, 664 F.2d 10, 11 (1er Cir. 1981). Los jueces llegan a su posición con la preparación y sus experiencias luego de dedicarle años al desarrollo de su

juicio y a la perfilación de su conciencia; habiendo cumplido con los deberes y con las funciones de los cargos que ocuparon anteriormente. Véase *Laird v. Tatum*, supra, pág. 833; Flamm, *op. cit.*, pág. 853, Sec. 28.3.3.

Al ser el Tribunal Supremo el Foro más alto de nuestra jurisdicción, cada Juez integrante es, en esencia, la autoridad de última instancia sobre la determinación de su capacidad e imparcialidad sobre una controversia.(6) Las normas de inhibición, tendentes a eliminar el potencial de prejuicio, arbitrariedad y a establecer las garantías de una decisión justa para las partes, imponen principios de conducta que van dirigidos a la conciencia judicial individual. En la gran mayoría de los casos, en el seno de este Foro, los Jueces han declarado su inhibición o su no intervención *sua sponte*, sin mediar una petición a los efectos. Siempre ha existido un total poder de apreciación individual sobre la procedencia de la inhibición formalmente solicitada, o las provistas por la Regla 4(e) del Reglamento del Tribunal Supremo de 1ro de mayo de 1996 (4 L.P.R.A. Ap. XXI-A). Tradicionalmente entre los miembros de este Tribunal siempre ha prevalecido el principio de que "[c]ontra los estados de inhibición moral no puede imperar la regla de la necesidad". *Pizarro Ortega v. Tribunal Superior*, 100 D.P.R. 774, 776 (1972), voto de inhibición del Juez Presidente Señor Negrón Fernández. Véanse: *Colegio de Abogados de P.R. v. Schneider*, 112 D.P.R. 540, 561 (1982); *Santiago v. Superintendente de la Policía*, 112 D.P.R. 205, 212 (1982); *In re Andréu Ribas*, 81 D.P.R. 90, 124 (1959).

La posición jurídica del Tribunal Supremo de Puerto Rico es en cierta forma parecida a la de la Corte Suprema de Estados Unidos, por tratarse de foros apelativos colegiados de última instancia, por lo que acudimos a la historia de esa curia para nuestra ilustración. En repetidas ocasiones, los Jueces de ese Tribunal han decidido cumplir con su función y no inhibirse de recursos. El tratadista John P.

---

(6) *Noriega Rodríguez v. Gobernador*, 120 D.P.R. 267, 277 (1988).

Frank expone de la manera siguiente la norma utilizada por los Jueces de la Corte Suprema de Estados Unidos:

> In short, Supreme Court Justices disqualify when they have a dollar interest; when they are related to a party and, more recently, when they are related to counsel; and when the particular matter was in one of their former law offices during their association; or, *when in the government, they dealt with the precise matter and particularly with the precise case*; otherwise generally no. (Énfasis suplido.) J.P. Frank, *Disqualification of Judges: In Support of the Bayh Bill*, 35 Law & Contemp. Probs. 43, 50 (1970).

Resulta pertinente que el Juez John Marshall, autor de la famosa decisión de *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), anteriormente había ocupado la posición de Secretario de Estado de Estados Unidos y, como función de ese cargo, le fue asignado el trámite de los nombramientos judiciales que eventualmente culminaron en esa decisión.

El Juez Robert H. Jackson no encontró causa para inhibirse sobre el recurso *McGrath v. Kristensen*, 340 U.S. 162 (1950), el cual trataba sobre una controversia sobre la cual él había decidido durante su término como Procurador General de Estados Unidos. En esa ocasión, el Juez Jackson participó en la decisión del tribunal, la cual resolvió la controversia de manera opuesta a lo anteriormente dictaminado por la Rama Ejecutiva.

Abundan los ejemplos de situaciones en que los Jueces de la Corte Suprema federal no se inhibieron de recursos sobre controversias que habían considerado antes de ser nombrados al tribunal. El Juez Oliver Wendell Holmes se expresó como Juez de la Corte Suprema de Estados Unidos sobre controversias sobre las cuales él ya se había expresado mientras servía como Juez de la Corte Suprema del estado de Massachusetts. Véanse: *Worcester v. Street Railway Co.*, 196 U.S. 539 (1905), que revisó el caso del mismo nombre publicado en 182 Mass. 49 (1902); *Dunbar v. Dunbar*, 190 U.S. 340 (1903), que revisó el caso publicado en 180 Mass. 170 (1901); *Glidden v. Harrington*, 189 U.S.

255 (1903), que revisó el caso publicado en 179 Mass. 486 (1901), y *Williams v. Parker*, 188 U.S. 491 (1903), que revisó la decisión publicada en 174 Mass. 476 (1899).

En *West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937), el Juez Charles Evans Hughes intervino en la resolución de una controversia sobre la cual había anteriormente escrito un libro. Por otro lado, el Juez Félix Fankfurter había escrito extensamente sobre el campo del derecho laboral antes de ser nombrado a la Corte Suprema federal, y hasta había colaborado en la redacción del proyecto de ley que vino a denominarse el *Norris-LaGuardia Act*; la expresión de sus opiniones no le impidió intervenir en casos en que se discutía esa ley. Véase *United States v. Hutcheson*, 312 U.S. 219 (1941).

Antes de llegar a la Corte Suprema de Estados Unidos, el Juez Hugo L. Black fue Senador de Estados Unidos. Al así desempeñarse fue el arquitecto del *Fair Labor Standards Act*; más adelante, mientras el Juez Black ejercía sus funciones judiciales fue el proponente de la opinión certificada en el caso *United States v. Darby*, 312 U.S. 100 (1941), la cual declaró la constitucionalidad de esa ley.

En *Laird v. Tatum*, supra, se solicitó la recusación del Juez William H. Rehnquist por razón de que éste, antes de ocupar su función como Juez de la Corte Suprema de Estados Unidos, había prestado testimonio ante un comité senatorial que investigaba las operaciones gubernamentales de inteligencia que se impugnaban en el caso. El Juez Rehnquist publicó un memorando para explicar las razones por las cuales no procedía su recusación y participó en la ventilación del caso, para convertirse en la eventualidad en el voto decisivo para la desestimación del recurso. Recordemos, además, que antes de llegar a ser Juez, Rehnquist había ocupado las posiciones de Director de la Oficina de Asuntos Legales del Departamento de Justicia de Estados Unidos y de la Oficina de Asuntos Legales de Casa Blanca.

Concluimos señalando que el caso de autos tiene una gran importancia, el cual plantea cuestiones constituciona-

les así como de interpretación de la Ley Electoral de Puerto Rico que trascienden a las partes y que participan de un extraordinario interés público. La función más alta que tiene esta Curia es la de interpretar nuestra Ley Suprema, la Constitución. No puede uno desentenderse livianamente de la responsabilidad que el cargo impone, al formar parte del cuerpo judicial colegiado de siete (7) jueces que examina e interpreta los derechos fundamentales de los que convivimos en esta tierra.

En *Noriega Rodríguez v. Gobernador*, 120 D.P.R. 267, 276 (1988), expresamos lo siguiente:

> ... [L]os Jueces de este Tribunal estamos sujetos a los preceptos constitucionales y a las normas legales y jurídicas establecidas. Nuestras decisiones requieren mayoría y la formación de una voluntad colectiva si han de ser las *opiniones del Tribunal*. Esto no ocurre así en los tribunales de instancia. El mecanismo colegiado asegura una justicia imparcial, serena restricción y celosa fiscalización de criterios. El recurso al disenso vehemente o al voto particular con sus modalidades, de amplia afirmación y utilización por este Tribunal, garantizan que la decisión final certificada responda al legítimo criterio mayoritario informado, nunca a la situación individual o preferencias privadas de los componentes del Tribunal. (Énfasis en el original.)

En el caso citado también expresamos en las págs. 275–276:

> ... A diferencia del tribunal de primera instancia, la inhibición de un Juez de este Cuerpo no conlleva la corriente práctica de *sustitución* de magistrados que allí impera con relativa facilidad. Nuestras decisiones exigen quórum y votación mayoritaria, ya actuemos en pleno o divididos en salas. ... En todo caso, la exigencia de composición mínima y de mayoría absoluta para decretar la inconstitucionalidad de una ley, conlleva que la inhibición de un Juez de este Tribunal revista interés excepcional. (Citas omitidas y énfasis en el original.)

No existe un estado de inhibición moral en nuestra conciencia.[6] Tomando en consideración las cuestiones

---

[7] *Cfr. Pizarro Ortega v. Tribunal Superior*, 100 D.P.R. 774 (1972).

constitucionales planteadas en este caso y nuestras obligaciones como miembros de este Alto Foro, decidimos mantener nuestra participación en el asunto. Denegamos la moción de recusación.

*Notifíquese a las partes por teléfono y por la vía ordinaria. Publíquese y únase a los autos.*