TS-3026                                                                    1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re:<br><br>    Pedro Colton Fontán | 2001 TSPR 115<br><br>154 DPR |

Número del Caso: TS-3026

Fecha: 8/agosto/2001

Oficina del Procurador General

                                        Lcda. Edna E. Rodríguez Benítez
                                        Procuradora General Auxiliar

                                        Lcda. Yvonne Casanova Pelosi
                                        Procuradora General Auxiliar


Procurador Especial de la Comisión:
                                        Lcdo. Luis M. Negrón Portillo


Abogados de la Parte Querellada:
                                        Lcdo. Angel Viera Martínez
                                        Lcdo. Felipe Benicio Sánchez


Materia: Moción de Inhibición

        Este documento constituye un documento oficial del Tribunal Supremo que está
        sujeto a los cambios y correcciones del proceso de compilación y publicación
        oficial de las decisiones del Tribunal. Su distribución electrónica se hace
        como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Pedro Colton Fontán                          TS-3026

Decisión emitida por el Juez Asociado señor Rivera Pérez referente a moción de inhibición.

San Juan, Puerto Rico, a 8 de agosto de 2001.

Acorde con los pronunciamientos de este Tribunal en Noriega Rodríguez v. Gobernador, 120 D.P.R. 267 (1988), se nos ha referido por el Juez Presidente interino, señor Rebollo López, para que evaluemos y resolvamos una moción presentada por el licenciado Roberto J. Sánchez Ramos, Procurador General de Puerto Rico. Mediante dicho escrito se solicita nuestra inhibición en la participación de la adjudicación de otra moción que pretende la reconsideración de una Resolución emitida por este Tribunal el 18 de junio de 2001, decretando la reinstalación del abogado de epígrafe a la práctica de la profesión legal.

Antes de entrar a los méritos de lo planteado por la Oficina del Procurador General de Puerto Rico, es de rigor establecer la norma establecida por este Tribunal que regula este tipo de procedimiento.

Presentada ante el Tribunal Supremo de Puerto Rico una moción que recusa a uno de sus jueces para que se inhiba de intervenir en algún recurso, debe remitirse al juez recusado para su consideración individual. La decisión de inhibición es exclusiva del Juez recusado. El Tribunal Supremo de Puerto Rico no tiene poder para excluir de un asunto pendiente ante sí a uno de sus miembros.[1] Este Tribunal es de origen constitucional, y dentro de ese esquema ocupa una posición insustituible en el sistema de distribución y equilibrio de los poderes públicos. Por génesis constitucional, el Tribunal Supremo es "el tribunal de última instancia en Puerto Rico".[2] Entre los miembros de la Convención Constituyente prevaleció el criterio que "la existencia y organización de un tribunal de última instancia deben ser garantizadas en la constitución misma".[3]

Este Tribunal ha pautado norma a los efectos de que al cumplir con nuestra función constitucional, los Jueces que lo componen tenemos por juramento una misión fundamental de expresión sobre los asuntos de honda repercusión pública que se someten vía los adecuados mecanismos jurisdiccionales. A diferencia del Tribunal de Primera Instancia y del Tribunal de Circuito Apelaciones, la inhibición de un juez de este cuerpo no conlleva la corriente práctica de sustitución de jueces que allí impera con relativa facilidad. Nuestras decisiones exigen quórum y votación mayoritaria, ya actuemos en Pleno o dividido en Salas. En todo caso, la exigencia de composición mínima y de mayoría absoluta para decretar la inconstitucionalidad de una ley, conlleva que la inhibición de un Juez de este Tribunal revista interés excepcional.[4]

El carácter vitalicio de nuestro nombramiento nos asegura una posición definida de independencia judicial, libre de las expresiones políticas que puedan gravitar sobre un candidato a otro término en el cargo. La Convención Constituyente abordó el tema con deliberada claridad y expresamente destacó que el nombramiento de por vida de los Jueces del Tribunal Supremo proveería la estabilidad requerida para asegurar la independencia judicial consagrada en el Artículo V de la Constitución de Puerto Rico.[5]

Los Jueces de este Tribunal estamos sujetos a los preceptos constitucionales y a las normas legales y jurídicas establecidas. Nuestras decisiones requieren mayoría y la formación de una voluntad colectiva si han de ser **las opiniones del Tribunal**. Esto no ocurre

---

[1] Noriega Rodríguez v. Gobernador, supra, pág. 274.

[2] Documentos Históricos, 1 L.P.R.A. Art. V, sec. 3, pág. 393.

[3] Noriega Rodríguez v. Gobernador, supra, pág. 275.
[4] Íd., págs. 275-276.

[5] Íd., pág. 276.

así en el Tribunal de Primera Instancia, ni en el Tribunal de Circuito Apelaciones. El mecanismo colegiado de esta Curia asegura una justicia imparcial, severa restricción y celosa fiscalización de criterios en el proceso de pautar el ordenamiento jurídico. El recurso al disenso vehemente o al voto particular, de amplia afirmación y utilización por este Tribunal, garantizan que la decisión y la opinión final certificada responda al legítimo criterio mayoritario informado, nunca a la situación individual o preferencias privadas de los componentes del Tribunal.[6]

Las normas de inhibición tendentes a eliminar el potencial de prejuicio, arbitrariedad y a establecer las garantías de una decisión justa para las partes, imponen principios de conducta que van dirigidos a la conciencia judicial individual. En un gran número de casos en el seno de este Foro los jueces han declarado su inhibición o su no intervención sua sponte sin mediar petición a los efectos. Siempre ha existido un total poder de apreciación individual sobre la procedencia de la inhibición formalmente solicitada.[7]

La norma pautada por este Tribunal, sobre este asunto, está a tono con la mejor doctrina y precedentes. Razones de peso percibidas por la mayoría de los foros colegiados estatales de última instancia y del propio Tribunal Supremo de Estados Unidos han llevado a esta Curia a reafirmarla.[8]

II

El Procurador General expone varias circunstancias que, a su juicio, ameritan nuestra inhibición. Arguye que el descargo de nuestra función judicial en el asunto ante nos está reñido e incide con lo dispuesto en los Cánones I, XI y XII(c) de Ética Judicial,[9] y en la Regla 63.1 de las de Procedimiento Civil.[10]

Para sostener su petición de inhibición del que suscribe, el Procurador General cita partes de nuestro voto de inhibición en el caso de Andino Torres, Ex parte.[11] Allí expresamos lo siguiente:

> La imparcialidad y objetividad con la cual deben proceder los jueces, es de tal importancia que la ley exige que cualquier causa que tienda a minar la confianza pública en el sistema de justicia, así **como razonablemente arrojar dudas sobre la imparcialidad para adjudicar, el juez deberá inhibirse de actuar en un pleito o procedimiento.** Regla 63 [sic] de las de Procedimiento Civil, 32 L.P.R.A. Ap. III;[12] Cánones de Etica Judicial, Cánones XI y XII(g), 4

---

[6] Íd.

[7] Íd., pág. 277.

[8] Íd.

[9] 4 L.P.R.A. Ap. IV-A.

[10] 32 L.P.R.A. Ap. III, R. 63.1.

[11] Res. el 3 de noviembre de 2000, 2000 T.S.P.R. 164, 152 D.P.R. ___ (2000), 2000 J.T.S. 176.

[12] La Regla 63 [sic] de Procedimiento Civil, supra, en lo pertinente, dispone:

L.P.R.A. Ap. IV-A. Estas normas establecen que el juez no solamente ha de ser imparcial, sino que su conducta ha de excluir toda posible apariencia de parcialidad. Bajo la norma de "*apariencia de parcialidad*", para que proceda la inhibición "*no es imprescindible probar la existencia de prejuicio o parcialidad de hecho; basta con la apariencia de parcialidad o prejuicio*".[13] Los tribunales de justicia tienen el deber de velar que la balanza en la cual se pesan los derechos de todos nuestros conciudadanos esté libre de sospechas, **aun cuando las mismas sean infundadas.**[14] Los jueces no deben aceptar encomiendas o labores que pongan en riesgo la imagen de imparcialidad y sobriedad que enaltece a la judicatura ni que arrojen dudas acerca de su capacidad para actuar con ecuanimidad.[15] (Énfasis en el original.)

Añadimos, sobre tal tema, lo siguiente:

Este criterio, que establece la inhibición por **cualquier causa que razonablemente pueda arrojar dudas sobre la imparcialidad para adjudicar,** exige que sea analizada desde el punto de vista de **un observador razonable, bien informado, con el conocimiento de todos los datos y circunstancias relevantes al caso, incluyendo aquellas que son de conocimiento general, como las que no están a la luz pública.**[16] Se recomienda examinar: (1) los hechos pertinentes; (2) el récord del caso; y (3) la ley aplicable.[17] **La imputación de parcialidad debe ser basada en hechos que produzcan duda razonable sobre la imparcialidad del juez en la mente de una persona razonable, no desde el punto de vista del juez, los litigantes o sus abogados.**[18] (Énfasis nuestro.)

**La experiencia que un juez ha adquirido durante su carrera, ya sea en la práctica privada como abogado, en una posición previa en otras ramas del gobierno, no es base suficiente para que éste se inhiba en procedimientos relacionados con esa experiencia.**[19] **Aun cuando el juez es influenciado, consciente o inconsciente, por sus experiencias, asociaciones o prejuicios desarrollados a través de su vida, nuestro sistema tiene una expectativa en que esas influencias y prejuicios sean echados a un lado, y adjudiquen con ecuanimidad ética e intelectual todos los pleitos ante su consideración.**[20] (Énfasis nuestro.)

Expresa el señor Procurador General que es de público conocimiento que este Juez compareció como abogado de récord del ex-gobernador Carlos Romero Barceló a las vistas celebradas en el año 1992 ante la Comisión de lo Jurídico del Senado de Puerto Rico, en

---

A iniciativa propia o a recusación de parte, un juez deberá inhibirse de actuar en un pleito o procedimiento en cualquiera de los casos siguientes:

...

(e) Por cualquier otra **causa que pueda razonablemente arrojar dudas sobre su imparcialidad para adjudicar o que tienda a minar la confianza pública en el sistema de justicia.** (Énfasis nuestro.)

[13] Santiago Mercado v. Desiderio Cartagena, 112 D.P.R. 205, 214 (1982); Pueblo v. Martés Olán, 103 D.P.R. 351, 355 (1975).

[14] Sucesión Ortiz Ortiz v. Campoamor Redín, 125 D.P.R. 106 (1990).

[15] In re Campoamor Redín, res. el 24 de enero de 2000, 2000 T.S.P.R. 13, 150 D.P.R. ___ (2000), 2000 J.T.S. 25.

[16] Richard E. Flamm, Judicial Disqualification: Recusal and Disqualification of Judges, Little, Brown and Company, § 5.6.4, § 5.8, pág. 163 (1996).

[17] Íd.

[18] Íd.

[19] Véase Ramírez de Ferrer v. Mari Bras, 142 D.P.R. 941 (1997).

[20] Santiago Mercado v. Desiderio Cartagena, supra.

torno al encubrimiento de los asesinatos ocurridos en el Cerro Maravilla. Solicita de este Tribunal que tome conocimiento judicial **"de que el licenciado Romero Barceló fue citado con el propósito de dilucidar su alegada intervención en el encubrimiento de dichos asesinatos"**. (Énfasis nuestro.) Para sostener su afirmación, y pedimento a este Tribunal, acompaña con su moción de inhibición una copia de la transcripción y de un video de lo acontecido ante esa comisión legislativa el miércoles 22 de abril de 1992. Dicha Comisión fue constituida ese día para la celebración de la vista pública "relacionada con la Resolución del Senado 31, resolución que encomendó a la Comisión de lo Jurídico la investigación de la planificación y encubrimiento de los asesinatos y otros crímenes cometidos el 25 de julio de 1978, en el Cerro Maravilla de la jurisdicción de Villalba, Puerto Rico".[21]

De dicha transcripción surge que el honorable Marcos Rigau, Senador, Presidente de la referida comisión legislativa, reconoció la presencia del licenciado Romero Barceló y de sus asesores legales, que identificó como el licenciado Virgilio Ramos, el licenciado Valcárcel y el licenciado Efraín Rivera.[22] Desde los inicios de la vista pública, el licenciado Romero Barceló intentó plantear un asunto sobre el uso de la representación legal. Después de algún esfuerzo le fue permitido hacer el planteamiento, contestándole una pregunta, en ese sentido al honorable Oreste Ramos, Senador. Sobre este aspecto surge de la transcripción lo siguiente:

> HON. RAMOS, ORESTE: Noto que no está su representación legal presente.
>
> LCDO. ROMERO BARCELÓ: No, no está, porque ante la resolución que se me envió de que se estaba cuestionando la (sic) actuaciones de Virgilio como asesor mío en este caso, licenciado Virgilio Ramos. **Y la amenaza de llevar, o sea, radicar una querella por violación a los cánones [sic] de ética [sic], yo le pedí al licenciado Virgilio Ramos y a los demás abogados, que aunque sé que lo que se plantea no tiene mérito alguno y que no tiene ninguna consecuencia, sin embargo, no deja de ser algo que a cualquier profesional le molesta tener sobre sus hombros, sobre su cabeza, una amenaza de que se le va [a] radicar cargos para que no pueda ejercer su profesión. Y no deja de ser una materia de preocupación. Como tanto el licenciado Virgilio Ramos, como los licenciados Francisco Valcárcel y Efraín Rivera están haciendo, sirviendo de abogados gratuitamente, dando de su tiempo profesional como amigos y compañeros. Yo no quiero llevar tampoco el cargo adicional y la preocupación adicional ante estas vistas de que ellos se vean acosados injustamente en esta forma. Y tengo que presumir que si se hace hoy con Virgilio Ramos, como se hizo anteriormente también unas veladas amenazas contra la representación anterior que yo tuve, pues también puede hacerse contra "Paco" Valcárcel, también puede hacerse contra Efraín Rivera y yo les pedí que no me representen, yo estoy aquí solo.** Y si en la Comisión me perturba, hostiga, me priva de escoger mis abogados, como es mi derecho constitucional, pues sencillamente que así sea y aquí estoy yo para seguir adelante.[23] (Énfasis nuestro.)

Expresa el señor Procurador General que "durante dicha vista se trajo a colación las actuaciones de encubrimiento del señor Colton durante el proceso investigativo de los

---

[21] Página 1 de la referida transcripción.

[22] Íd.

[23] Transcripción, págs. 3-4.

incidentes del Caso Maravilla y se inquirió sobre el conocimiento, si alguno, que pudo haber tenido el licenciado Romero Barceló de ese hecho". Expresa que, a manera de ejemplo, y con el propósito de ilustración sobre la forma que se inquirió sobre tal asunto al ex-gobernador Romero Barceló "se le preguntó sobre la presencia del señor Colton, entonces Director de la División de Investigación Criminal del Departamento de Justicia en la Fortaleza unos días antes de que éste diera a conocer los resultados de la investigación del Departamento de Justicia en la cual exoneraba de la (sic) responsabilidad a los policías que participaron en el operativo en el Cerro Maravilla". Para sostener su afirmación de lo que se inquirió al ex-gobernador Romero Barceló sobre su conocimiento relativo a la conducta del señor Colton durante la investigación de los sucesos, hace referencia a partes de la transcripción que surgen de las páginas 7 y 8, 41 y 68. Veamos.

De las páginas 7 y 8, 9 y 10, de la referida transcripción surge, sobre este asunto, lo siguiente:

> HON. RAMOS, ORESTE: Bien. Ha desfilado testimonio ante esta Comisión en el sentido de que tuvo usted reuniones con los Fiscales Colton y Figueroa Vivas. Y se ha tratado de implicar que estaba usted tratando de tomar control de la investigación, saltando por encima del Secretario de Justicia. Lo mismo se ha, hecho con relación al Superintendente Cartagena o antes de eso, Cartagena como Superintendente Auxiliar o Jefe de Operaciones de Campo. ¿Qué comentarios le merece a usted ese testimonio o imputaciones?

> LCDO. ROMERO BARCELÓ: En primer lugar, señor Senador, todas las personas que trabajan conmigo o que tenían conocimiento de cómo yo trabajaba mientras era Gobernador y cómo trabajó [sic] también en la vida privada, saben y sabían que yo bregaba con las personas a quien yo les había encomendado una labor. Y que creo mucho en que cada persona tiene que asumir las responsabilidades de lo que tiene a su cargo, y que yo bregaba con los miembros de Gabinete. Teníamos, obviamente, ayudantes en Fortaleza que bregaban con varias agencias, porque no podía yo estar disponible a las necesidades de cada departamento en cada momento. Y por eso es que se establecen los ayudantes en Fortaleza, que bregan con distintas áreas. Pero si yo tenía que bregar con un departamento, obviamente, bregaba siempre a través del Secretario, en el caso que fuera un departamento constitucional o director, en caso de una autoridad o el presidente en caso de una corporación pública. Y si tenía necesidades de bregar con alguien específicamente, pues con presencia del presidente o con conocimiento del presidente o el director o el secretario siempre. Porque si no, pues para qué tener esa persona a cargo de esa agencia y cómo [sic] esas posiciones están a voluntad del Gobernador. O sea, que en cualquier momento que el Gobernador diga "Mira, no te necesito, tú no me haces falta" pues adiós, renuncia. No hay que dar ni justificaciones en estos casos, pues son posiciones que están a disposición del Gobernador, y yo funcionaba en esa forma. Y yo, además, tengo mucho respeto por la dignidad humana; y yo no puedo tener una persona a cargo de algo y menospreciarlo porque ir por encima de él o por debajo de él o cómo [sic] sea, es menospreciar esa persona.

> Tanto con Roberto Torres González como con Miguel Giménez Muñoz como con los demás secretarios y directores, pues bregaba con ellos. Lo que Colton y Figueroa, lo que ocurre que, la declaración mía en el 19... –¿cuándo fue que depuse en el caso? creo que fue en el 1980– cuando se me pregunta sobre el informe, yo tenía recuerdo de haberme sentado con el Secretario de Justicia, así como también con Figueroa y con Colton para discutir el informe. Yo no recordaba en aquel momento[,] ni se me recordó[,] ni se me trajo a la atención de que yo no estaba en Puerto Rico. Y yo, obviamente, asumí al contestar, que estaba en Puerto Rico y que me reuní con ellos estando en Puerto Rico, antes de que se diera a la publicidad, que era lo lógico, pero yo no estaba en Puerto Rico. Y eso, ahora es que me venía a percatar durante estas vistas de que yo no estaba en Puerto Rico en aquellos momentos y que, obviamente, ahí hay una, había una contradicción. La única explicación que podemos tener a esto es lo que dijo el Secretario de Justicia, que él había hablado por teléfono conmigo en ese caso y hemos discutido el informe y los hallazgos y siendo él como era en aquel momento también, que tampoco estaba consciente de eso al momento que declaré en el '80, en aquel momento, el Secretario de Justicia era el

Gobernador.  O sea, que yo estaba afuera y estaba afuera también "Poto" Paniagua.

Al rendirse el informe de Colton y Figueroa al Secretario de Justicia, en ese momento, el 29 de agosto, el Secretario de Justicia es Gobernador también.  No hay manera que ese informe cuando se rinde por Colton y Figueroa al Secretario de Justicia, no se supiera en el Departamento y en Puerto Rico que ya se había rendido el informe. Y había un compromiso de parte mía, público, de hacer el informe público y lo que yo ahora mismo no recuerdo en la conversación, pero yo, uno poniendo, juntando dos más dos, porque en ese momento se me consultó, hablamos sobre la cuestión de darle publicidad porque la prensa, obviamente, estaría pidiendo ese informe en aquel momento, tendría que tener ese conocimiento que se había rendido y se autorizó, una vez que me dieron las conclusiones, se autorizó para que se hiciera la conferencia de prensa.

Y cuando yo regresé a Puerto Rico nos reunimos y entonces pasamos por el informe, conjuntamente acompañando de las declaraciones, se pasó por encima de ellas, no, me explicaron.  Y luego, me dieron el informe oficialmente, el informe sin las declaraciones y eso, que eso se queda allá en el Departamento de Justicia.  Esta es [sic] las conclusiones a que yo llego ahora retrospectivamente, pero eso son, de eso hace 14 años.  Y realmente la, es una cuestión de composición, porque no tenía en aquel momento, yo entendía que yo estaba en Puerto Rico y si yo estaba en Puerto Rico no hay manera de que ése se hubiera dado a la publicidad sin haberse reunido conmigo primero.  Eso tenía que ser así y como estaba afuera, pues entonces fue por teléfono, como dijo el Secretario de Justicia.

HON. RAMOS, ORESTE: Aquí vemos entonces, cómo cuando usted hace algo con relación a estas imputaciones se le imputa entonces hacer algo, que supuestamente no debió haber hecho. Como tratar de acelerar los procedimientos, agilizarlos, tomar un interés particular.  Por el contrario, si no lo hace, se le imputa negligencia o no estar interesado en el asunto. Yo me acuerdo del discurso de "Palo si bogas y palo si no bogas".  Quisiera sus comentarios al respecto también.

LCDO. ROMERO BARCELÓ: Sí, cómo [sic] no, Senador, con mucho gusto. Precisamente, en aquella época, mirando retrospectiva [sic], mirando ahora hacia atrás, 14 años después, uno dice; –bueno, un mes de investigación no era tanto para un caso como éste–, pero en aquel momento parecía una eternidad. Y en aquel momento, y a la prensa y al pueblo aparentemente le parecía una eternidad y dondequiera se estaba exigiendo ¿cuándo viene el informe?, ¿cuándo termina la investigación?, ¿qué está pasando?  Y había en esas preguntas también, una insinuación de que se estaba amapuchando, de que si se estaba tardando se estaba amapuchando, que eso debía estar ya.  Y por eso el interés que yo demostré de que se acelerara el proceso de investigación, porque era que había continuo interés de cuándo va a salir el informe.  Y si no hubiera salido el informe en, para fines de agosto, pues hubiera más, esa presión hubiera aumentado, hubiera sido todo cada día mayor.

Pero vuelvo y repito, ahora uno mira retrospectiva [sic] y dice; –caramba, un mes no fue tanto–.  Pero en aquel momento parecía una eternidad. Y era como usted dice y bien señala: "palo si bogas y palo si no bogas".  **Lo que tiene que haber aquí durante toda esta investigación en todas las declaraciones que hay aquí, yo estoy, no tengo la menor duda que esto tiene que ser así, es que no hay ningún momento, pero ningún momento donde nadie que trabajó conmigo, que haya sido llamado aquí a investigar, puede haber dicho en momento alguno que yo le pedí que hiciera algo impropio o inmoral o ilegal relacionado con este asunto o con cualquier otro asunto.** (Énfasis nuestro.)

Y estoy seguro que eso tiene que constar de las declaraciones que hay en sesiones ejecutivas, en las que le llaman las sesiones esas escondidas, de ultratumba, que no hay, no son ejecutivas, no están los Senadores de ninguno de los partidos en esas sesiones y no se sabe cuándo se llevan a cabo, y las vistas públicas.  **En todo eso, no hay ninguna ocasión donde eso pueda haber sido así.  Porque es que no había eso.  Y Colton y Figueroa sabían, igual que el Secretario de Justicia, que mi interés era que se encontrara la verdad.** (Énfasis nuestro.)

De las páginas 41 y 42 de la transcripción surge lo siguiente:

HON. MARTÍN GARCÍA: Le pregunto, don Carlos, el, usted ha testificado, y aclárame si estoy equivocado, que en algún momento antes de usted haberse ido a su viaje a Estados Unidos días antes de la fecha en que se entrega el informe Figueroa–Colton, de hacerse público, usted, le pregunto, ¿si testificó

que usted debe haberse reunido en algún momento por lo menos con Figueroa y Colton y quizás también con Figueroa, Colton y Miguel Giménez Muñoz?

LCDO. ROMERO BARCELÓ: Pude haberlo declarado, si lo declaré yo entiendo que fue un error al yo analizar el hecho de que yo estuve fuera ese fin de semana y no regresé hasta el 30, con los hechos en el caso, obviamente eso no ocurrió. Porque cuando yo me reuní con Figueroa, con Colton y estoy casi seguro que con el Secretario de Justicia, **se vio el expediente completo del caso tanto el informe como las declaraciones que estaban, que tenía Justicia, ellos repasaron, indicaron los, el informe y yo iba ojeando mientras ellos hablaban, luego se me entregó el informe del Gobernador, no sé si se me dejó allí en aquel momento se me envió el que no contiene los documentos completos, sino que es el informe que se rinde por los investigadores**. Y eso, pues obviamente ocurrió después que yo regresé y no antes, o sea, después de la conferencia de Prensa [sic] y que la conversación que hubo con el Secretario de Justicia, fue por teléfono anteriormente a la publicación de que era en aquel momento el Secretario de Justicia, Gobernador de Puerto Rico. (Énfasis nuestro.)

HON. MARTIN GARCÍA: Pero sí usted estuvo y expresó, le pregunto, satisfacción con los resultados.

LCDO. ROMERO BARCELO: Eso es correcto, sí.
De las páginas 68, 69 y 70 de la transcripción surge lo siguiente:

HON. HERNÁNDEZ AGOSTO: ...del proceso de esa investigación. ¿Cuántas reuniones usted celebró con Colton –si recuerda– y Figueroa Vivas sobre esta investigación.

LCDO. ROMERO BARCELO: **La reunión sobre la autopsia –cuando me vinieron a informar y vino con el Secretario de Justicia a informarme que iban a desenterrar los cadáveres para hacer otra autopsia– y la reunión sobre el informe. Esas fueron las reuniones**. (Énfasis nuestro.)

HON. HERNANDEZ AGOSTO: ¿Dos? ¿Dos reuniones?

LCDO. ROMERO BARCELO: Y que en la reunión con el informe, que mi mejor recuerdo es que estaba presente también el Secretario de Justicia –y según aclaré esta mañana– fue después de mi regreso del viaje que tenía. Y una...

HON. HERNANDEZ AGOSTO: Usted...

LCDO. ROMERO BARCELO: ...Conversación telefónica que aparentemente tuve con el Secretario de Justicia.

HON. HERNANDEZ AGOSTO: Usted se ha referido aquí, aquí ha habido información en dos sentidos, de dos personas, de Giménez Muñoz de que esas reuniones fueron previas a la publicación del informe. Y que, y que, y que, fue en Fortaleza que se determinó qué se hacía público y qué no se hacía público. Y hay declaraciones de "Tony" Quiñones Calderón, persona en quien usted confía y que le atribuye un buen recuerdo, diciendo que esas reuniones se celebraron antes de hacer público el informe.

LCDO. ROMERO BARCELO: "Tony" está equivocado, obviamente, como estuvo equivocado también sobre el hecho de que declaró de que el memorando, las manifestaciones públicas que se le enviaron a El Nuevo Día que él las preparó acá en San Juan sin que yo interviniera en la redacción. Yo estoy seguro que "Tony" en eso está equivocado, porque yo enmendé las declaraciones que preparó "Tony" y que yo mismo escribí sobre ese documento que envió "Tony" y finalmente, el producto final fue uno corregido por mí. Igualmente, "Tony" obviamente está equivocado en eso, que se cree que fue antes, porque yo estaba fuera de Puerto Rico mientras el informe estaba preparándose; y fuera de Puerto Rico, obviamente, no podía yo haber tenido esa reunión.

Cuando yo declaré en la deposición, como expliqué esta mañana, yo no tenía conocimiento, no se me recordó que yo estaba fuera y yo presumí que la reunión fue antes. Porque si yo, si iba a hacerse público un informe y yo estaba en Puerto Rico, tenía que haber sido antes.

HON. HERNANDEZ AGOSTO: O sea, que su...

LCDO. ROMERO BARCELO: Pero no estando en Puerto Rico, fue una llamada telefónica –según dijo aquí y declaró el Secretario de Justicia entonces, Miguel Giménez Muñoz– y posteriormente, cuando yo regresé fue la reunión que tuvimos sobre el informe.

HON. HERNANDEZ AGOSTO: ...o sea, que su recuerdo de cuándo usted discutió ese informe, hoy, es mejor que su recuerdo de junio de 1980.

LCDO. ROMERO BARCELO: No mi recuerdo, no mi recuerdo. El análisis que estoy haciendo y que he hecho de todo lo que ocurrió. Porque obviamente, yo no pude haberme reunido durante el fin de semana si estaba fuera de Puerto Rico. Pero si iba a haber un informe, se iba a dar a la publicidad, obviamente yo tenía que haberme reunido antes si yo estaba en Puerto Rico. Pero al no estarlo, la comunicación fue por teléfono, según dijo el licenciado Giménez Muñoz.

¿Y qué es lo que explica todo eso? Eso se explica en la siguiente manera. Que el licenciado Giménez Muñoz, que era el Secretario de Justicia, ese fin de semana estaba actuando como Gobernador, porque estaba el licenciado "Poto" Paniagua, que era el Secretario de Estado, estaba también allá en los Estados Unidos, precisamente bregando con mi deposición ante las Naciones Unidas. Cuando viene el informe al Secretario de Justicia, el Secretario de Justicia recibe el informe como Secretario de Justicia, pero en ese memento también es Gobernador. Y tiene que conocerse, sabía en Puerto Rico que ese informe se rindió, porque aquí ese tipo de cosas no se guardan en secreto. Y la prensa estaba exigiendo el informe y me llamó por teléfono, hablamos sobre el informe, me da las conclusiones y las recomendaciones y yo autorizo, estoy de acuerdo con él a que se dé a la publicidad el informe y que, como se hizo.

Y cuando regreso el día 30, en algún momento, 30 ó 31, tenemos la reunión con los, Colton y Figueroa donde está también el Secretario de Justicia, que es mi mejor recuerdo, que estaba en esa reunión cuando me explicaron el informe, donde está, tenían ellos el informe que se me rinde a mi más las declaraciones y otros documentos que acompañan ese informe en el Departamento de Justicia.

El señor Procurador General utiliza y hace referencia a dichas partes de la transcripción para afirmar que "la **posible interrelación** entre el señor Colton y el licenciado Romero, sobre el encubrimiento por Colton de los sucesos del Cerro Maravilla **fue un asunto que se discutió en el senado y que, forzosamente, fue tema sobre el cual el entonces abogado Rivera Pérez debió asesorar a su cliente previo a dicha vista**". (Énfasis nuestro.)

Expresa el señor Procurador General que el desaforo del señor Colton obedeció a su rol activo y protagónico en el encubrimiento de los asesinatos, evidenciado por su conducta durante la investigación que dirigió como Director de la División de Investigaciones Criminales del Departamento de Justicia.[24] Afirma que **la participación activa** de este Juez como abogado del ex-gobernador Romero Barceló es suficiente para inhibirnos de participar desde sus inicios en la consideración, atención y adjudicación de la solicitud de reinstalación a la profesión legal del señor Pedro Colton Fontán. Toda vez que ese no fue el criterio del que suscribe, el señor Procurador General afirma con vehemencia que se vio forzado a solicitar nuestra inhibición en esta tan tardía etapa de los procedimientos. **Le solicita a este Tribunal que tome conocimiento judicial de los reportes periodísticos que sobre el asunto de la inhibición de este Juez se han publicado en la prensa como evidencia**

---

[24] La razón del desaforo del señor Colton Fontán fue el haber incurrido en negligencia crasa en el desempeño de sus funciones durante la referida investigación. La opinión y sentencia dictada por este Tribunal en dicho asunto no contiene determinación alguna, como cuestión de hecho y de derecho, a los efectos que el señor Colton Fontán hubiera incurrido en conducta intencionalmente dirigida a encubrir los asesinatos acaecidos en el Cerro Maravilla. In Re Colton Fontán, 128 D.P.R. 1 (1991).

**de cómo alegadamente se ha perjudicado la imagen de la justicia en el país y de la dignidad y objetividad de esta Curia.**

III

Antes de entrar en los méritos de lo planteado es menester atender dos instancias, por virtud de las cuales el Procurador General solicita que se tome conocimiento judicial de ciertos hechos, para apoyar su pedimento. Veamos.

La Regla 11 de las de Evidencia[25] dispone, sobre este tema, lo siguiente:

(A) Los tribunales podrán tomar conocimiento judicial de hechos que no son razonablemente objeto de controversia por:

(1) Ser de conocimiento general dentro de la jurisdicción territorial del tribunal, o

(2) Ser susceptibles de determinación inmediata y exacta recurriendo a fuentes cuya exactitud no puede ser razonablemente cuestionada.

(B) Los tribunales podrán tomar conocimiento judicial, a iniciativa propia y deberán tomar conocimiento judicial a solicitud de parte cuando ésta provea al tribunal con información suficiente para permitirle que tome tal conocimiento.

(C) La parte que solicita que se tome conocimiento judicial de un hecho debe notificar a la parte adversa para dar oportunidad a ésta de prepararse y enfrentarse a la solicitud, si así lo estimare conveniente. Una parte tiene derecho a ser oída en torno a si procede tomar conocimiento judicial.

(D) Los tribunales podrán tomar conocimiento judicial en cualquier etapa de los procedimientos, incluyendo la etapa apelativa.

(E) En casos criminales por jurado el juez instruirá a los miembros del jurado de que deben aceptar como concluyente cualquier hecho del cual se haya tomado conocimiento judicial.

Esta regla regula lo relativo al conocimiento judicial de hechos adjudicativos. El modo usual de la determinación de hechos es la presentación de evidencia, ya sea testifical, documental o de otra índole. Si hay hechos específicos de los cuales no puede razonablemente dudarse, resulta absurdo el desfilar evidencia en apoyo de su determinación. El punto esencial es la indisputabilidad de los hechos. Si el Tribunal entiende que están presente los criterios de indisputabilidad establecidos en la Regla 11(A), supra, puede tomar conocimiento judicial sin haberlo solicitado parte alguna. Como el criterio central es la indisputabilidad de hechos, y esto no depende en forma alguna de la etapa en que se encuentra el proceso, es legítimo tomar conocimiento judicial en cualquier etapa del caso, incluyendo la fase apelativa.

El Procurador General solicita que tomemos conocimiento judicial de determinado propósito y objetivo de la referida comisión legislativa al requerir la presencia del ex-gobernador Carlos Romero Barceló durante sus sesiones. Pretende que tomemos conocimiento judicial de que dicha persona fue citada con el propósito de dilucidar su alegada intervención en un encubrimiento del delito de asesinato. Es de conocimiento general que la Comisión de lo Jurídico del Senado de Puerto Rico para el año 1992 estaba realizando una investigación sobre los aspectos de planificación y encubrimiento de los

_____

[25] 32 L.P.R.A. Ap. IV, R. 11.

sucesos del Cerro Maravilla. Las preguntas que se le dirigieran al ex-gobernador Romero Barceló durante la vista pública celebrada el 22 de abril de 1992 fueron enmarcadas y dirigidas por el interés de indagar si éste se había reunido con los fiscales Pedro Colton Fontán y Ángel Figueroa Vivas, y con qué propósito. De las partes anteriormente transcritas de dicho documento consta claramente el texto de las preguntas y las contestaciones ofrecidas por el ex-gobernador Romero Barceló.

La incidencia que surge de la página siete (7) de la transcripción demuestra, por la intervención del honorable Oreste Ramos, Senador, que previamente se había desfilado testimonio ante la referida comisión a los efectos de que el ex-gobernador Carlos Romero Barceló se había reunido con los fiscales Colton Fontán y Figueroa Vivas. El Senador Ramos le preguntó sobre la existencia de dichas reuniones y su propósito. Su pregunta no estuvo enmarcada en un señalamiento sobre la existencia de evidencia previa que relacionara al ex-gobernador con acto ilegal alguno. Este último contestó la pregunta; vertió su conocimiento sobre las referidas reuniones y su propósito. Lo pretendido por el Procurador General es improcedente por inmeritorio.

El Procurador General pretende que tomemos conocimiento judicial de reportes de prensa relativos a la no inhibición de este Juez en este asunto, dirigidos a evidenciar alegados efectos perjudiciales que tal actuación ha producido sobre la imagen de la justicia en el país y de la dignidad y objetividad del Tribunal Supremo de Puerto Rico. Concluimos que no es posible evidenciar lo que se pretende tomando conocimiento judicial, como hecho indubitado, de lo contenido en unos reportes de prensa. No es procedente, por inmeritorio, conceder lo aquí solicitado.

IV

¿En qué sostiene el Procurador General su pedimento sobre inhibición? ¿Realiza en su escrito aseveraciones en forma detallada y específica? ¿Acompaña evidencia para sostenerlo? **Concluimos que no. Su petitorio no está sostenido por la verdad. Se fundamenta en la especulación y la conjetura. Veamos**

La Regla 4(e)(2) de nuestro Reglamento dispone, sobre el tema, lo siguiente:

**(2) En el caso de que se presentare una recusación o petición de inhibición a uno de los(as) Jueces del Tribunal, el(la) Secretario(a) enviará la moción de recusación o petición de inhibición al (a la) Juez objeto de la misma quién decidirá sobre el particular, sin la intervención del pleno.** (Énfasis nuestro.)

Al entender en una recusación, los(as) Jueces del Tribunal podrán tomar en consideración las causales de inhibición que establecen la ley, los cánones de ética judicial y las tradiciones judiciales.

Cualquier Juez podrá inhibirse motu propio sin tener que expresar los motivos para tal inhibición.

Cualquier recusación de un juez deberá ser jurada y expondrá los hechos en que se funda. Dicha recusación deberá ser presentada tan pronto el solicitante advenga en

conocimiento de la causa de recusación.[26] La moción de inhibición del Procurador General no está jurada. Fue acompañada con las referidas copias de la transcripción y video. De las mismas surgen las intervenciones de los miembros de la Comisión y de sus funcionarios, durante la celebración de la misma y las variadas preguntas dirigidas al ex-gobernador Carlos Romero Barceló, y sus respuestas. Fueron anejados dichos documentos a la moción de inhibición para sostener lo alegado con relación a la **posible** interrelación entre el señor Colton y el ex-gobernador, sobre el encubrimiento por el señor Colton de los sucesos de Maravilla, como un asunto que alegadamente se discutió en el Senado, y que forzosamente fue tema sobre el cual el que suscribe **debió haber asesorado al ex-gobernador Carlos Romero Barceló previo a dicha vista, por haber fungido activamente como su abogado durante las vistas.** El Procurador General no apoya su pedimento de inhibición en aseveraciones específicas, detalladas y concretas. Las mismas son conclusorias y vagas. Se basan en conjeturas y especulaciones. Tampoco presentó evidencia de que el que suscribe tuviera contacto o se enfrentó en el descargo de su responsabilidad profesional con prueba alguna referente a conducta o actuación del ex-gobernador, en el supuesto encubrimiento de un delito público. **Tal proceder es consecuencia de que su petitorio no está sostenido en la verdad.**

El ex-gobernador Romero Barceló reclutó nuestros servicios para finales del año 1991,[27] para realizar una evaluación de los procedimientos que intentaba utilizar la Comisión de lo Jurídico del Senado de Puerto Rico al invitarlo a testificar en las vistas ejecutivas y públicas que estaban celebrando con relación a los sucesos del Cerro Maravilla, desde la perspectiva del derecho constitucional. Nuestra labor estuvo ubicada en analizar la constitucionalidad de ciertos y determinados procesos legislativos utilizados por la referida comisión legislativa y cómo podían afectar las garantías y derechos constitucionales que el ex-gobernador disfrutaba como cualquier otro ciudadano, a tenor con la Constitución de los Estados Unidos y de Puerto Rico. Durante mi gestión profesional en este asunto no tuve contacto ni me enfrenté a prueba alguna que vinculara al ex-gobernador Romero Barceló con los hechos que dieron lugar al procedimiento disciplinario seguido ante este Tribunal, y que concluyó en la separación de la profesión del señor Colton Fontán. No conozco al señor Colton. Nunca lo he visto personalmente, ni me he reunido con él. Las razones, como cuestión de hecho y de derecho, que tuvo esta Curia para suspender de la profesión al señor Colton no advinieron a mi conocimiento hasta después que fue publicada la Opinión emitida por este Tribunal el 21 de febrero de 1991, y en la misma forma que se enteran todos los demás abogados del país. La preparación y estudio que realicé para descargar el servicio que me solicitó el ex-gobernador no incluyó, por no ser necesario,

---

[26] Regla 63.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 63.2.
[27] La adjudicación por esta Curia de los asuntos planteados durante el proceso disciplinario que dio lugar a la separación de la profesión legal del señor Colton ocurrió el 21 de febrero de 1991.

el análisis de dicha Opinión. Mi encomienda no tenía ninguna relación con los hechos contenidos en la misma y mucho menos con lo allí pautado.

La inhibición de un juez, bajo el concepto de apariencia de parcialidad, descansa en aquella duda razonable que se pueda desprender de su conducta. No es imprescindible probar la existencia de prejuicio o parcialidad de hecho, basta con la apariencia de parcialidad o prejuicio. Este criterio exige que cada caso sea analizado desde el punto de vista **de un observador razonable bien informado, con el conocimiento de la verdad de todos los datos y circunstancias relevantes al caso, incluyendo aquellas que son de conocimiento general, como las que no están a la luz pública.** Para la obtención de dichos datos o información **es recomendable examinar los hechos pertinentes; el récord del caso y la ley aplicable, entre otros.**

En el asunto ante nos el Procurador General levanta su pedimento de inhibición, fundamentado en la apariencia de prejuicio o parcialidad. No existen datos, circunstancias o información alguna de que se hubiere desfilado previamente a la vista del 22 de abril de 1992 evidencia ante esa comisión que vinculara al ex-gobernador Romero Barceló con encubrimiento de delito público alguno. El Procurador General no hace relación específica y detallada sobre cuál fue la función profesional del que subscribe en el referido proceso legislativo, y en qué consistió el contacto nuestro con el mismo, que a su vez tiene relación con las cuestiones de hecho y de derecho que considera esta Curia en el día de hoy, en reconsideración, como consecuencia de la solicitud de reinstalación del señor Colton. No desglosa, en forma específica y detallada, cómo las cuestiones de hecho y de derecho que fueran consideradas por este Tribunal para tomar la decisión de separar al señor Colton de su profesión tienen relación con "la posible interrelación entre el señor Colton y el licenciado Romero Barceló sobre el encubrimiento por Colton de los sucesos del Cerro Maravilla", según alegado por dicho funcionario en su moción de inhibición. **No lo hizo porque su pedimento de inhibición no se sostiene en la verdad de lo que estuvo ni está a la luz pública y es de conocimiento general, sino que tampoco de aquella verdad que se refleja de la transcripción y el video presentado; ni mucho menos de la verdad que no estuvo a la luz pública, ni es de conocimiento general.**

Mediante una extensa Opinión, de fecha de 21 de febrero de 1991, este Tribunal dictó sentencia, separando permanentemente al señor Colton Fontán del ejercicio de la profesión de abogado. El señor Colton presentó el 7 de junio de 1996 una petición solicitando de este Tribunal que redujera la sanción impuesta de separación permanente a una de cinco (5) años, los cuales ya había cumplido. Esta petición fue suscrita y endosada por veinte y tres (23) distinguidos miembros de la profesión legal. Mediante Resolución de 28 de junio de 1996, este Tribunal "a los fines de evaluar su posible reinstalación al ejercicio de la abogacía" refirió la petición del señor Colton a la Comisión de Reputación de Aspirantes al Ejercicio de la Abogacía para evaluación e informe. Después de celebradas las vistas

correspondientes y con el beneficio del informe rendido por la Comisión de Reputación de Aspirantes al Ejercicio de la Abogacía y del entonces Procurador General, honorable Gustavo Gelpí, el asunto quedó sometido.

Este Tribunal consideró que la seriedad y desgracia de lo ocurrido en el Cerro Maravilla y la gravedad de la conducta observada por el señor Colton, es incuestionable. Consideró, además, que sus actos fueron tan serios y graves que este Tribunal entendió procedente separarlo de manera permanente del ejercicio de la abogacía. Determinamos que tal asunto no estaba en controversia al atender, considerar y adjudicar su solicitud de reinstalación. No obstante, entendimos que el asunto ante nuestra consideración estaba enmarcado en si el señor Colton Fontán **hoy día** es una **persona apta** para ejercer la profesión de abogado. Concluimos, que el señor Colton Fontán goza de excelente reputación en la comunidad en que vive; está seriamente arrepentido de la conducta antiética en que incurrió, por la cual fue disciplinado; y que está totalmente rehabilitado desde el punto de vista moral y profesional. Este Tribunal se rehusó a utilizar como factor o elemento exclusivo para evaluar y adjudicar la referida solicitud de reinstalación la gravedad y seriedad de la conducta observada y que lo movió a separarlo de su profesión hace diez (10) años. Este Tribunal, al resolver en la forma que lo hizo, no entró a considerar ni mucho menos a cuestionar las conclusiones de hecho y de derecho formuladas por esta Curia hace diez (10) años atrás al decretarse el desaforo del señor Colton. Las cuestiones de hecho y de derecho consideradas por este Tribunal en su Resolución de 18 de junio de 2001, para adjudicar la referida solicitud de reinstalación no están relacionadas, por no constituir una reconsideración del dictamen sobre el desaforo, con las causas que dieron motivo al mismo, ni muchos menos con lo acaecido durante el desarrollo del proceso legislativo ante la Comisión de lo Jurídico del Senado de Puerto Rico, en ocasión de la comparecencia del ex-gobernador Carlos Romero Barceló. El proceso ante esta Curia en este asunto estuvo gobernado por el mecanismo colegiado, que asegura en todos los casos una justicia imparcial, producto de una severa restricción y celosa fiscalización de criterios. Respondió al legítimo criterio mayoritario debidamente informado.

V

La moderna práctica *increscendo* de solicitar festinadamente inhibiciones de jueces debe abandonarse. Las infundadas peticiones de inhibición violentan el sano equilibrio y trastocan la independencia judicial imprescindible en nuestro sistema de separación de poderes. Por otro lado, las garantías procesales de los jueces, en estas situaciones, deben reconocerse para que puedan defenderse de ataques improcedentes. Al advenir a esta noble profesión, al juez no puede considerársele como que renuncia a defender su honra y dignidad, así como su título y trabajo. La judicatura de Puerto Rico es bastión de pureza que todavía sobrevive al ataque vicioso que es signo de la militancia contemporánea, y sobre el abogado recae la obligación de preservar el honor del juez en todos sus actos. No podrá haber

civilización si decaen la magistratura y la abogacía; brazos inseparables de la justicia.[28] El abogado, en el descargo de su responsabilidad como representante de su cliente, debe actuar sin temor cuando tiene motivos fundados para solicitar la inhibición de un juez; sin embargo, debe ser cauteloso y prudente, sobre todo, cuando el motivo de la inhibición que invoca como causa es conducta del juez alegadamente reñida con la ética judicial, y mientras más grave sea su imputación, mayor **debe ser su ponderación de las bases de la misma.** La fe en la justicia se nutre y se fortalece con el concepto de alta moralidad que se tenga a quienes la imparten. En el descargo de su obligación como servidores de la justicia, los abogados deben ser celosos guardianes del prestigio de quienes tienen esa difícil y noble misión. **Jamás deben hacerse eco de información que puedan desmerecerles, a menos que estén en condiciones de sustanciarla cumplidamente. Deben recordar que la calumnia respecto a los hombres y mujeres de honor deja huella de infamia.**[29]

El hecho de que el abogado piense y considere que el proceso judicial está plagado de prejuicio, parcialidad o fuese uno discriminatorio, no le concede una licencia para utilizar sus escritos y comparecencias como medio de difamar y atacar personalmente a los jueces. Tampoco le concede inmunidad para la utilización de vocabulario denigrante hacia la dignidad de los miembros del foro judicial.[30] El recurrir al apuntamiento que un Juez actuó "con prejuicio, pasión y parcialidad" sin sustentarlo o sin motivos fundados para así creerlo, lo hemos considerado como un comportamiento censurable que debe ser rechazado. Tal conducta y estilo forense rebasan el ámbito de lo legítimo, y debe desalentarse.[31]

En este asunto, el señor Procurador General y los demás funcionarios que como abogados de esa oficina subscribieron y firmaron la moción que pretende la inhibición de este Juez, **se apartaron de la verdad de los datos, circunstancias relevantes e información que son de conocimiento general y están a la luz pública, así como de aquella que no lo está,** de la forma y manera que exige y requiere el estándar de una persona razonable y prudente. Concluimos que un **observador objetivo, razonable y prudente, con conocimiento específico y detallado de esa verdad, no tenía base razonable ni motivo fundado para dudar de la imparcialidad de este Juez**, por virtud de su participación en el proceso seguido por este Tribunal al atender, considerar, evaluar y adjudicar la petición de reinstalación a la profesión legal del señor Colton. Mucho menos para lanzar las graves y muy serias

[28] J.Cuevas Segarra, Tratado de Derecho Procesal Civil, San Juan, Ed. J.T.S., 2000, T. II, pág. 1116; In re Vázquez Báez, 110 D.P.R. 628 (1981).

[29] J. Cuevas Segarra, op. cit., págs. 1116-1117; In re Córdova Álvarez, 116 D.P.R. 895 (1986); In re Criado Vázquez, 108 D.P.R. 642 (1979).

[30] J. Cuevas Segarra, op. cit., pág. 1117; In re Matos González, res. el 17 de diciembre de 1999, 99 T.S.P.R. 182, 149 D.P.R. ____ (1999), 2000 J.T.S. 6; In re Córdova Álvarez, supra.
[31] In re Córdova Álvarez, supra.

imputaciones que se levantaran en dicho escrito.[32]  Es triste y lamentable que dicha conducta, que está vedada a todos los abogados, haya sido incurrida por el Procurador General y por abogados de su oficina, que tienen la obligación de ser celosos guardianes del prestigio de los Jueces de este Tribunal y del Tribunal de Circuito de Apelaciones, y que son, además, funcionarios de este Cuerpo en el trámite de los procesos disciplinarios, entre otros.

## VI

Por los fundamentos antes expuestos, declaramos no ha lugar, por inmeritoria, la moción de inhibición presentada.

Notifíquese y publíquese.

Efraín E. Rivera Pérez
Juez Asociado

---

[32] El Fénix de Puerto Rico v. M/Y Johanny, 36 F. 3d 136, 140 (1st Cir. 1994); Carbana v. Cruz, 595 F. Supp. 585, 587 (1984); In Re: United States, 666 F. 2d 690, 695 (1st Cir. 1981); Blizard v. Frechette, 601 F. 2d 1217 (1st Cir. 1979).